## Reynolds v. Thompson.

(Decided December 18, 1914.)

## Appeal from Harrison Circuit Court.

1. Gifts—Gift Inter Vivos.—To constitute a valid gift inter vivos, the purpose of the donor to make the gift must be clearly and satisfactorily established, and the gift must be complete by actual, constructive, or symbolical delivery without power of revocation.

2. Gifts—Inter Vivos.—To constitute a gift inter vivos, the property must be delivered absolutely, and the gift must go into immediate effect. Where future control over the property remains in the donor until his death, there is no valid gift inter vivos.

3. Trusts—Creation of.—When a settlor is possessed of the legal title to the subject-matter of the settlement he may create a valid trust thereof, either by a declaration that he holds the property in trust, or by a transfer of the legal title to the property to a third party upon certain trusts. If he makes himself the trustee, no transfer of the subject-matter is necessary; but if he make a third

party trustee, he must transfer to him the subject of the trust in such a mode as will be effectual to pass the legal title .

4. Trusts—Creation of.—A mere intention to convey property in trust is not sufficient to create a trust, if the proper steps are not taken for the purpose of making a valid transfer of the legal title to the intended trustee.

5. Trusts—Disposition of Note in Trust—When Not Complete.— Where the owner of a note left it in the hands of his agent, and frequently declared his intention of giving the note to a ward of the agent, but never carried out the intention by endorsing or delivering the note so as to pass the legal title to the guardian, there was no valid disposition of the note in trust.

M. C. SWINFORD for appellant.

T. E. KING for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The purpose of this appeal is to finally determine whether the appellee, James Thompson, is the owner of a mortgage note executed by Dunn, for $500.00, which he claims as a gift from the appellant, Francis Reynolds.

The appellant, Francis Reynolds, is now more than 89 years of age. He had spent most of his life in Harrison county, Kentucky; but some time previous to October, 1907, he removed to Dayton, Ohio, where he became an inmate of the Soldiers' Military Home.

R. E. Smith, a successful merchant of Harrison county, Kentucky, was the friend and business adviser of Reynolds. In the fall of 1907, Smith undertook to place at interest, secured by a mortgage, $500.00 which Reynolds had saved. This was done by buying a real estate lien note which L. M. Dunn had executed to J. W. Boyd on November 26, 1907, for $500.00, and secured by a lien upon Dunn's land. It was endorsed in blank by Boyd and delivered to Smith, who kept it until his death in March, 1911.

On January 10, 1908, Boyd made the following transfer upon the deed book in which the Dunn mortgage was recorded in the Harrison County Court Clerk's office, to-wit:

"For value received I hereby transfer this note to Francis Reynolds of Nat'l. Miltary Home of Ohio. This the 10th day of January, 1908.

"Attest: W. R. Curle, Clerk.          J. W. Boyd."

On December 3, 1912, Reynolds brought this action against Dunn, the mortgagor, and James Thompson and

Minnie Smith, the widow and executrix of R. E. Smith, seeking to recover a judgment for the $500.00, and to enforce the mortgage upon Dunn's land to pay the note. Reynolds did not file the note with his petition, giving as his reason for not doing so, that he left it with R. E. Smith for safe keeping; that Smith was dead, and upon his death the note went into possession of his wife, Minnie Smith, who then had possession of same and refused to deliver it to Reynolds, claiming that the defendant, James Thompson, had some interest in the note. Thompson was called upon to assert any interest or ownership he claimed in the note.

He answered, alleging that at the time the Dunn note was bought with Reynolds' money, in 1907, Smith was Thompson's statutory guardian; and that in January, 1908, Reynolds gave and delivered the note to Smith as the statutory guardian for Thompson, as an absolute gift; that Smith so received the note; and that Smith and his wife had so held it ever since.

The issues having been thus made as to the gift of the note by Reynolds to Thompson in January, 1908, and tried upon that issue, the chancellor was of opinion that the evidence established a gift *inter vivos;* but, if he was mistaken in that conclusion, he was nevertheless of the opinion that the gift should be upheld as a parol, voluntary trust; and in either of said events it was irrevocable by Reynolds. The chancellor rested his decision upon the authority of Howard, Admr. v. Marshall, 156 Ky., 20, 51 L. R. A. (N. S.), 1208.

To reverse that judgment, Reynolds appeals.

Reynolds' wife was the grandmother of the appellee James Thompson and his brother John Thompson. Their father had died when the boys were quite young, and Reynolds, their step-grandfather, had raised them from the time they were quite young, until they were perhaps 14 or 15 years old. Thompson afterwards took the name of Francis as his own middle name, and was thereafter generally known as his step-grandfather's namesake. After Reynolds' wife died, he discontinued housekeeping and went to live at the Soldiers' Home, at Dayton, Ohio.

The testimony of Reynolds bears the usual marks incident to great age, in that his ideas are sometimes disconnected and poorly expressed. He says, among other things, that during the summer of 1908, some six or eight months after the investment was made, he went to the clerk's office, in Harrison county, where the clerk

read to him the note which he had bought from Boyd, and that after reading it upon the margin of the deed book, he was satisfied of its validity and the regularity of his purchase.

It will be remembered the assignment upon the deed book recited that it was a transfer of "the within *note* to Francis Reynolds." Throughout the subsequent transactions relating to the note Reynolds always contended that it was in the clerk's office, in Harrison county. He seemed to think the assignment was the note, and that the assignment was the only evidence of Dunn's indebtedness to him.

When R. E. Smith died in March, 1911, his wife, the defendant Minnie Smith, qualified as his executrix and as guardian of the appellee, Thompson. She found among her husband's papers a carefully kept account of his trust as guardian of James Thompson, in which he had charged himself with $30.00 interest on the $500.00 in November, 1908, and again with the same amount in November, 1909, the account reciting in each instance that the $30.00 was "interest on mortgage note for year ending November 26, 1908," and 1909, respectively.

Upon James Thompson reaching his majority, Minnie Smith made her settlement as his guardian in May, 1911, in which she adopted the account left by her husband; and although James Thompson had then reached his majority, Minnie Smith kept possession of the note, suggesting that Thompson ought not to have possession of so much money, or that it would be best for him to leave it in her possession.

Mrs. Cavanaugh, of Cincinnati, Ohio, was the niece of Reynolds' wife, and consequently the kinsman of Thompson.

In August, 1912, appellee James Thompson, who had theretofore and for several years, been living with Mrs. Cavanaugh, in Cincinnati, Ohio, joined the regular army and was thereafter stationed at Fort Des Moines, Iowa. In the following October the appellant, Francis Reynolds, left the Military Home, at Dayton, and went to live with Mrs. Cavanaugh, in Cincinnati, where he has since remained. By reason of this separation, the communications between Reynolds and Thompson have been principally, if not entirely, by letter.

As early as October 20, 1908, R. E. Smith wrote to Reynolds, at Dayton, a long letter which, among other things, contained this paragraph:

"The interest on the Boyd note is due soon. Should the party want to pay interest upon interest, for instance, $30.00 now due; should he keep and pay upon $530.00 for next year, or must he pay the $30.00 now?"

The record contains no answer to this letter, but it is claimed by Thompson that there must have been an answer in which Reynolds at least gave the interest to the boy, since Smith charged himself as guardian with the $30.00 interest which accrued in November, 1908, and with a like sum which accrued in November, 1909.

Subsequently, in a letter undated, but evidently written to Thompson before September 14, 1912, Reynolds used this language:

"I have no claim nor there is none against you getting your money any time from that man or any one else that owes you, or me, Francis Reynolds. If I was you I would make that man pay me or Mr. Billy Boyd, and you see Judge King and the clerk of the court and get them to get your mortgage to James Thompson right off; or Swinford, he is the mayor of the city. Now, you see Mr. Swinford and don't let Billy Boyd fool you. Judge King will tell you and get it for you. Write to me for any information and I will give it."

Reynolds made his will on May 16, 1908, in which he appointed Smith his executor, the second clause thereof reading as follows:

"2. It is my will and I direct that my late wife's grandson, James Francis Thompson, is to have that certain land note for $500.00, and all interest due or accruing thereon, which was executed by L. M. Dunn and Pearl Dunn to J. W. Boyd, and assigned in writing to me."

The will was carefully drawn by a lawyer, and properly describes the note. Thompson knew of the existence of the will and of the disposition of the note as therein made, as will subsequently appear.

On June 18, 1912, Thompson wrote from Cincinnati to Mrs. Smith, saying:

"I was up to see grandpa about that mortgage, and he said it was all right; no one could bother it. He said it was willed to me at his death, so you needn't bother about it. I guess we will let him keep it on. I will tell you more about it when I come up."

Thompson denies having written this letter; but it was found among his papers when he left Mrs. Cavanaugh's to go to the army in August, 1912. It was signed by

Thompson, and is, undoubtedly, in his handwriting. At this time Reynolds was living in Dayton.

On September 14, 1912, Reynolds, writing from Dayton, to Thompson, said:

"Did you get the recording money at home or not. It is $500.00. If you didn't, write at once and let me know; that money is all yours, nobody else will get it. I heard you got all the money that Miss Smith owed you. If there is anything wrong write and let me know while I am alive. I will sign any paper that is required; let them know I count that money as yours. I guess they will be satisfied to pay it to you. Billy Boyd is bound for that money and mortgage."

Reynolds denies that he wrote said letter, although his name and address are signed to it. But, at another place in said letter, he uses this expression: "I am not able to write, but got a man from Cincinnati to do so." And while the letter is evidently not in Reynolds' handwriting, it was undoubtedly dictated by him.

After Reynolds went to Cincinnati in September, 1912, Mrs. Cavanaugh conducted his correspondence for him; and at Reynolds' request she wrote to Thompson, who answered from Fort Des Moines, Iowa, on October 16, 1912, as follows:

"I received your letter and glad to hear from you; and was surprised to hear that grandpa was there. * * * About this note, I didn't get any of it yet; tell him that he will have to sign his name on the back of the mortgage before it can be collected; no one won't take it. Dunn would have paid it off before now but no one won't take it unless it is signed. When it is signed there won't be any trouble. King is the one that said it was no good unless it was signed; he looked at it when I was in the country. King will write him about it and he will fix it up all right. King can send it to him to sign, or grandpa can go up, either one. I think it is about time to do something with it. You know about what to do. I told you about it when I was there. You can explain it to grandpa all right and see that it is fixed all right this time. You can write me everything you want to know about it and I will tell you all I know. The mortgage is in the National Bank, of Cynthiana, Ky. King can get it. Miss Minnie has it in her deposit box in the bank so you can see where it is if he wants it."

Again, on November 14, 1912, Thompson wrote to Mrs. Cavanaugh, as follows:

"Did grandpa fix the note up yet or not? It looks like it could be fixed up by this time. It ain't any use leaving it as it is. If I had a little of it now I could pay off the little debts I owe; and if I don't get it I will try and pay it off a little every month."

Thompson was indebted to Mrs. Cavanaugh for board. On November 15, 1912, Reynolds wrote the clerk of the Harrison County Court to send him a certified copy of the Dunn mortgage which secured the $500.00 note in controversy:

Ten days later, on November 25, 1912, Thompson wrote to Mrs. Cavanaugh, as follows:

"In regard to that note it was taken out some time in November; I just don't remember the date of it. The man's name is Lark Dunn, of Connersville, Ky. It looks funny that it can't be paid without suing for it; that's the way of things that is half fixed up. I guess in the wind-up I won't get any of it. Well, if I don't I have got two hands; I can get more."

Finally, on December 15, 1912, Thompson wrote Reynolds, from Iowa, as follows:

"Well, grandpa, I heard that you had sued Dunn for the money on the note which is up in the country. I think it was all unnecessary for doing that. In the first place the man has never refused to pay the note; he was never asked to pay it. Yet he told me when I wanted the money to notify him and he would pay it; or if he didn't have the money, he would borrow it and pay the note off. He would have had the note paid off already if you had signed the note as I asked you to do. All the trouble is that no one will take a hold of the note until it is signed; it is only money thrown away for a lawyer. King would have fixed it up all right if you had signed the note."

This closes the correspondence.

Mrs. Minnie Smith testified that she overheard a conversation between her husband, R. E. Smith, and the appellant Reynolds, regarding the note, in which Reynolds told Smith he wanted to give it to "Jim" when he was 21 years old; that he had given the rest of the children more than that; that he didn't want any of the Cavanaughs to have any more, and that he wanted his namesake to have that note.

Mrs. Cavanaugh testified that she went to Dayton to visit Reynolds while Thompson was living at her house in Cincinnati; that on the day before making the visit she informed Thompson of her intended trip to see Reynolds,

whereupon Thompson said: "When you go I wish you would ask grandpa about that note in Cynthiana. Mrs. Smith has a note and no one will buy it until it is signed; and ask him about this note." She further testified that Thompson said the note was for $500.00, and directed her to tell Reynolds it was the Dunn note.

When Mrs. Cavanaugh went to Dayton she found Reynolds in the hospital; and when she repeated Thompson's message to him, Reynolds seemed puzzled about it, saying, "I don't understand it at all;" that he didn't know of any note Mrs. Smith had but the $300.00, and Jim had got that when he became of age. But after thinking a while, Reynolds said: "Could he mean my mortgage note that Mr. Smith got for me? But I don't know how Mr. Smith could have gotten my note." Reynolds finally said to Mrs. Cavanaugh that when she went back to Cincinnati she should write to Mrs. Smith and express to her his sympathy about her husband's death, and to tell her to have nothing to do with his mortgage note, because he would see to that in the fall.

Reynolds further told Mrs. Cavanaugh that he had willed the note to Jim, but that he had given it to no one; and Mrs. Cavanaugh understood the note was in the court house.

Upon her return to Cincinnati the next day, Thompson asked Mrs. Cavanaugh if she had spoken to Reynolds. She answered that she had, and that Reynolds had said the note was willed to Thompson, and he did not understand how Mrs. Smith got the note. To this Thompson said, "All right."

Are these facts sufficient to constitute a gift of the note from Reynolds to Thompson?

The law as to what will amount to a gift *inter vivos* is well settled.

In 20 Cyc., 1192, it is said:

"A gift *inter vivos* is a contract which takes place by the mutual consent of the giver, who divests himself of the thing given in order to transmit the title to it to the donee gratuitously, and the donee who accepts and acquires the legal title to it. It operates, if at all, in the donor's lifetime, immediately and irrevocably; it is a gift executed; no further act of parties, no contingency of death or otherwise, is needed to give it effect."

And again, on page 1193 of the same volume, it is said:

"To constitute a valid gift *inter vivos,* the purpose of the donor to make the gift must be clearly and satisfactorily established, and the gift must be complete by actual, constructive, or symbolical delivery, without power of revocation."

In Stark v. Kelley, 132 Ky., 376, 382, this court announced the same rule, in the following language:

"To constitute a gift *inter vivos,* the property must be delivered absolutely, and the gift must go into immediate effect. Where future control over the property remains in the donor until his death, there is no valid gift *inter vivos.* 20 Cyc., 1211; 14 Am. & Eng. Encyc. of Law, 1015; 4 Words and Phrases, 3092. In Duncan v. Duncan, 5 Litt., 12, this court said: 'It is perfectly clear that the court below was mistaken in supposing that the transaction in this case amounted to a valid gift *inter vivos.* To the validity of such a gift it is essential that there should be a delivery to the donee, and that the property or the thing given should immediately pass and be irrevocable by the donor.' "

It is insisted, however, for appellee, that Smith and his wife, who held possession of this note ever since it was bought with Reynolds' money, held it as guardian for Thompson, and that this is shown by the fact that Smith charged himself, as guardian, with the interest on the note for the two years 1908 and 1909. But Smith did not charge himself with the note in the account which he left of his trust as guardian; he charged himself with the interest only.

Furthermore, his letter of October 20, 1908, to Reynolds, inquiring about the collection of the interest, clearly and fully recognized Reynolds' ownership of the note; and when we recall that the petition rests plaintiff's case upon a gift made in January 1908, nearly nine months before the letter was written, it is clear that the gift or trust must have been made, if at all, after October 20, 1908.

The petition claims the gift was made to Thompson when Boyd made the assignment upon the deed book in January, 1908, that the assignment and delivery of the note to Smith constituted the gift. But this contention rests upon the untenable proposition that Smith thereafter held the note as guardian for Thompson. Smith's subsequent letter of October 20, 1908, clearly shows that he then held the note as the agent of Reynolds, and not as the guardian of Thompson. The burden is upon Thomp-

son to show that the capacity in which Smith held the note was changed; and this he has wholly failed to do.

Considering all the testimony, it is apparent that, although Reynolds upon more than one occasion used loose language that might be construed to show an intention to make gift of the note to Thompson, it is plain he was always careful to retain the legal title to the note, and never changed the character of Smith's possession. He never actually parted with it; he only talked about doing so.

Intention is not sufficient to constitute a gift *inter vivos;* it must be carried out by conveying the title and possession as fully as it may be done under the circumstances. Deck v. Harris's Exr., 145 Ky., 739.

The fact that the note always remained in the possession of Smith, who certainly was acting in 1908 as the agent of Reynolds, and fully recognized his title and ownership to the note upon the only occasion he spoke of it, leaves the burden upon Thompson to show that the character of Smith's holding was changed from that of the agent of Reynolds to that of guardian of Thompson. This has not been done. On the contrary, treating Smith's charge of the interest to himself as guardian as competent for the purpose of the argument, it in no way questions Reynolds' ownership of the note. It was a most natural thing for Reynolds to retain the note and give the interest to Thompson as it accrued. In his will Reynolds speaks of the interest that had theretofore accrued, and gives it, together with the note, to Thompson, to take effect upon the death of Reynolds.

Furthermore, in view of the fact that this $500.00 note constituted practically all of Reynolds' estate, the court will be slow to indulge a presumption that he intended to deprive himself of practically all of his estate in his old age. That will only be done upon satisfactory proof.

If we should go beyond the scope of the petition and consider whether the proof is sufficient to constitute a voluntary disposition of the note in trust for Thompson, we are met by the same rule which requires the trust to be effectually created, and that a mere intention which has not been carried out, will not be sufficient.

The rule is stated as follows in Bispham's Equity, section 66:

"It has been said that in order to create a valid trust there must not be merely an inchoate intention, but

that the transaction must be complete. This rule, it must be remembered, applies more particularly to trusts which are created by voluntary dispositions, and which may be conveniently considered in this place.

"For a trust may arise either out of a contract or out of a gift, and the distinction, which it is desirable to remember, is this, viz., that in trusts which grow out of contracts, and which are therefore based upon a consideration, it is not necessary that the intention should have proceeded to the same extent as is required in trusts which are purely voluntary. And this is only an application of the rule which exists at common law in reference to the distinction between contracts and gifts, as the former rest *in fieri,* whereas a gift can only be effectual after the intention to make it has been followed by actual delivery of possession or some equivalent act. 'A true and proper gift or grant is always accompanied with delivery of possession, and takes effect immediately. * * * But if a gift does not take effect by delivery of immediate possession, it is not then properly a gift, but a contract.' The common law rule, therefore, in reference to the transfer of legal titles, has been followed in equity as to the creation of equitable estates; and trusts which are purely voluntary—that is, those which do not depend upon or grow out of a consideration—must, to be effectually created, be accompanied by the delivery of the subject of the trust, or by some act so strongly indicative of the donor's intention as to be tantamount to such delivery. An imperfect conveyance, which is also merely voluntary, will not be aided or enforced in equity."

And again in section 67 of the same work, the author gives the general result of the authorities, as follows:

"When a settlor is possessed of the legal title to the subject-matter of the settlement, he may create a valid trust thereof, either by a declaration that he holds the property in trust, or by a transfer of the legal title to the property to a third party upon certain trusts. In other words, he may constitute either himself or another person the trustee. If he makes himself the trustee, no transfer of the subject-matter is necessary. If he makes a third party trustee, he must transfer to him the subject of the trust in such a mode as will be effectual to pass the legal title. But if there is a mere *intention* to convey the property upon trusts, this will not be sufficient if the proper steps are not taken for the purpose of mak-

ing a valid transfer of the legal title to the intended trustee. Such was the case of Milroy v. Lord (4 De G., F. & J., 264), where a deed of assignment of stock, unaccompanied, however, by a *transfer of the stock,* was held ineffectual to create a trust. * * *

"It may be observed that, according to some English authorities, an assignment which is ineffectual to pass the legal title may yet take effect as a declaration of trust; so that the result of the abortive attempt of the assignor to convey the legal title would be, under those authorities, to constitute him a trustee of that title for the party designed to be benefited. But these decisions have not been approved in later cases, and the true doctrine would seem to be laid down in Milroy v. Lord, as stated above."

Applying this rule to the facts of this case, we are of opinion the chancellor erred in sustaining Thompson's claim to the note. Howard v. Marshall, *supra,* relied upon by appellee, is not inconsistent with the rule above announced. In that case the gift was completed by an endorsement and delivery of the note.

The judgment is reversed, with instructions to enter a judgment recognizing Reynolds' ownership of the note, and for all further necessary orders.