CASE 43—ACTION BY C. W. KELLEY AND OTHERS AGAINST
J. W. STARK, TO CHARGE HIM WITH CERTAIN
NOTES BELONGING TO THE ESTATE OF J. J.
KELLEY, DECEASED.—November 18, 1908.

## Stark v. Kelley

Appeal from Warren Circuit Court.

JOHN M. GALLOWAY, Circuit Judge.

Judgment for plaintiff.    Defendant appeals—Affirmed.

2. Gifts—"Gifts Causa Mortis"—Essentials.—A gift causa mortis inter vivos, the property must be delivered absolutely, and the gift must go into immediate effect, and where future control over the property remains in the donor until his death, there is no valid gift inter vivos.

2. Gifts—"Gifts Causa Mortis"—Essentials.—A gift causa mortis exists where property is given in the donor's last sickness or in other imminent peril, and takes effect only on his death through the disorder or peril, and is revocable during his life.

3. Gifts—Gifts Causa Mortis—Transportation Not Constituting.— That several months before dying decedent gave notes to defendant excludes the idea of a gift causa mortis.

4. Gifts—Gifts Inter Vivos—Evidence—Sufficiency.—Evidence held insufficient to show a gift of notes inter vivos.

LINDSAY & EDELEN and WRIGHT & McELROY, for appellants.

### POINTS AND AUTHORITIES.

1. The gift was freely and voluntarily made. It is established by satisfactory, convincing and uncontradicted evidence. The court below was no more authorized to set it aside than it would be authorized to annul any other legitimate transaction supported by the testimony sufficient to sustain it. (McCoy's Admr. v. McCoy, 31 Ky. Law Rep. 1189.)

2. It is respectfully submitted that the judgment of the court below is flagrantly against the evidence. (Merriweather v. Morrison, 78 Ky. 72; Roche v. George's Executor, 93 Ky. 609; Cyclopedia of Law and Procedure, p 1222; Knott v. Hogan, 4 Met. 99; Strelow v. Vonderhide, 3 Ky. Law Rep. 472; Couchman v. Couchman, 98 Ky. 109.)

SIMS, DuBOSE & RHODES and JOHN B. GRIDER for appellees.

### POINTS AND AUTHORITIES.

1. A gift causa mortis cannot be sustained when the donor is in good health, merely on the ground that he is old, and must look forward, in the ordinary course of nature, to dissolution in a few years or months; and even though such a gift is made when the donor is ill, and death is imminent, yet such a gift is void if the donor recovers. (Albro v. Albro, 23 Ky. Law Rep. 1555, 1556; Lisle v. Tribble, 92 Ky. 306; Dickeschied v. Exchange Bank, 28 W. Va., 340; Weston v. Hight, 35 Am. Dec. 250.)

2. A gift inter vivos cannot be sustained, which is to take effect at the death of the donor. (Duncan's Admr. v. Duncan, 5 Littell, 12; Walden's Admr. v. Dixon, 5 Monroe, 170; Knott's Admr. v. Hogan, 4 Met. 100; Rodemer v. Rettig, 71 S. W. 869; Lisle v. Battman, 72 Am. St. R. 706; Basket v. Hassall, 107 W. S. Sup. Ct. Rep. (27 Law Ed.) 500; Butler v. Scofield, 4 J. J. M. 139; 14 Am. & Eng. Enc. of Law, p. 1015; 20 Cyc. p. 1211; 4 Words and Phrases, 3092; Telford v. Patton, 33 N. E. Reporter, 1121.)

3. The evidence is overwhelming that no gift was made or attempted.

OPINION OF THE COURT BY JUDGE HOBSON—Affirming.

J. C. Kelley died intestate in December, 1906, a

resident of Warren county. His will was duly admitted to probate, and J. W. Stark, the executor named in the will, qualified. Stark claimed that the testator had given him in his lifetime $8,000 worth of notes, and these notes he did not list in the appraisement of the estate. This suit was brought by the devisees seeking to charge him with the notes. The chancellor entered judgment in their favor, and Stark appeals.

The testator was a bachelor 78 years old at his death. He had no own brothers and sisters, but four half-brothers and a sister, the children of his father by a second marriage. By his will, which he made in the year 1892, he devised his whole estate to these brothers and the sister. He had at his death an estate consisting of land worth about $10,000, and notes and personal property, including the $8,000 in controversy, amounting to $10,000 or $11,000.

The proof for Stark is briefly as follows: D. W. Wright, who was his attorney and had written his will, testified that in February or March, 1906, Kelley was talking to him about his estate, and asked him whether he could make a gift of his notes, and whether the delivery of his notes to a person he wanted to have them would be good. Wright told him that it would be. Dr. A. C. Wright, who was his physician and old friend, testified that in March, 1906, he received a message through J. W. Stark that Kelley wanted to see him; and he and Stark went to Kelley's house in a buggy. After they had taken dinner, Kelley went to his desk, got his pocketbook, sat down between them, and commenced taking out some notes, and handing them to Stark to read and approximate the interest. Stark would take up a note and examine it, and Kelley would take another. They kept on in

that way until the notes in the pocket-book were exhausted. Mr. Stark then said: "All right, Jim, I will take care of them and put them in the bank; and, when you are ready for them, they will be forthcoming." Kelley replied: "No; they are yours. I don't want them. I don't want to have anything more to do with them. They are yours absolutely. I sent for you for that, and they are yours." All the notes claimed by Stark were not handed to him in March at the time referred to by Dr. Wright, but Dr. Wright testified that he and Stark were there in May, that at the visit in March, Kelley said there were some other notes which he would hunt up and hand over to him, and that, when they were there in May, Kelley handed Stark some notes saying: "Here are those notes." Dr. Wright also testified that Kelly gave Stark his bank passbook at the time he gave him these notes, J. E. Porter testified that Stark was a first cousin of Kelley, and that they were very close and intimate friends, and had been for years, and so did several other witnesses, who also testified that Kelley spoke of John Stark and his father being the best friends that he ever had; that when he had nothing they helped him; that he had about paid them back now, but remembered them for their kindness. The kindness consisted in their lending him money without security when he had been forced into bankruptcy, by means of which he had accumulated the property he then had. W. D. Hays, who had given some notes to Kelley, testified that Kelley said to him shortly before his death that he need not be uneasy about the notes; that he had given them to Stark, the person who had done more for him than anybody else; and that, if he needed any more money, Mr. Stark might let him have it. Robert Bunch, who lived on the place with Kelley,

testified that he heard Kelley say that he had given his notes to Mr Stark; but, on cross-examination, this witness leaves it uncertain whether the notes were given for collection or as a gift.

The proof for the devisees is briefly as follows: On May 29th Stark's son borrowed of Kelley $3,000, and J. W. Stark signed the note as his surety. This $3,000 was checked out of bank by J. C. Kelley. The note was payable 12 months after date, and is one of the notes now claimed by Stark. On August 20, 1906, Stark collected from E. D. Thomas the amount of one of the notes handed to him by Kelley, and made this indorsement on it: "Paid to me for J. C. Kelley and deposited to his credit." He made a similar indorsement on the same day upon a note executed by Crit Smith. Another of the notes claimed by Stark is one for $1,400, dated February 29, 1904, given by his son with Stark as surety. On the back of this note is this indorsement: "Paid in check $84.60 this March 26, 1906." On June 6, 1906, Stark collected on one of the notes handed to him $219.50 in a check which he wrote himself, and which was made payable to J. C. Kelley. Another note included in those handed to him when Dr. Wright was present was collected by Stark the following summer, and the money was handed by him to Kelley, who in his presence paid it over to Dr. Wright on his doctor's bill. The other sums collected by Stark on the notes were all deposited to Kelley's account in the bank, and Kelley continued to draw checks upon the account as long as he lived, leaving a moderate balance to his credit at his death. When Stark did not include these notes in his appraisement, there was a hearing before the county court, and on that hearing Stark was asked to explain why, if these notes had been given to him, he de-

posited all the money he collected on them to Kelley's credit, and Kelley checked it out of the bank. His answer was in these words: "It was done because I understood the gift from other conversations that had occurred between Kelley and me to be complete at his death. I construed it that way myself." A negro man named John Kelley and his two sisters were old family servants. J. C. Kelley, shortly before his death, wished to make them a present of $500 each. He gave them a check for $500, and gave a note for $1,000 due December 1st, which Stark signed as his surety. After this had been done, John Kelley wanted to sell J. C. Kelley a piece of land for $200, and the latter said that he did not have any more money in bank. Stark then said: "But if Jim and Willie will advance that much, $200, on what he owes you." J. C. Kelley then said that he would take the land, and instructed John Kelley to have the deed made. On another occasion a neighbor who wanted to pay a note went over to pay it. Kelley said that Stark had his note, and that he would get it. In a day or two the neighbor came back. Kelley had the note, collected the money, and used it.

We have no doubt of the truthfulness of Dr. Wright's testimony, and we are satisfied that every fact that he states occurred as he states it. We are also satisfied that J. C. Kelley intended that Stark should have the notes or so much of them as were left at his death; but the evidence leaves no room for doubt that Kelley actually controlled the funds as long as he lived. While what occurred in Dr. Wright's presence would be sufficient to show a gift if it stood alone, that conversation must be taken in connection with other conversations between the two parties and their subsequent conduct when we come to de-

termine its legal effect. While it would seem that Kelley was willing to give this property to Stark, Stark did not accept the gift, but held the notes for Kelley, acting no doubt upon what he considered to be his old friend's real purpose. In other words he did not consider that Kelley meant to strip himself then of a large part of his estate, but he understood that he meant that he was to have this property when Kelley died; and this is manifestly shown by Kelley's subsequent conduct. It is evident that the $1,000 that was given to the two old servants, as well as the $200 to be paid for the land, was to come out of the $3,000 note which Stark's son had executed with his father as surety.

To constitute a gift inter vivos, the property must be delivered absolutely, and the gift must go into immediate effect. Where future control over the property remains in the donor until his death, there is no valid gift inter vivos. 20 Cyc. 1211; 14 Am. & Eng. Encyc. of Law, 1015; 4 Words and Phrases, 3092. In Duncan v. Duncan, 5 Litt. 12, this court said: ''It is perfectly clear that the court below was mistaken in supposing that the transaction in this case amounted to a valid gift inter vivos. To the validity of such a gift it is essential that there should be a delivery to the donee, and that the property of the thing given should immediately pass and be irrevocable the donor.'' In Knott'r Adm'r v. Hogan, 4, Metc. 100, the court again said: ''In relation to the various requisites of a valid gift, a vast amount of obstruse learning is to be found in the decisions of the courts, English and American, upon this subject. And, conflicting as those opinions are upon most other points, it seems to be agreed, on all hands, that it is essential

to every gift of this class that it should be irrevocable by the donor.''

But it is insisted that the gift may be sustained as a gift causa mortis. A gift causa mortis exists where property is given by the donor in his last sickness, or in other imminent peril. It takes effect only in the event of his death by the existing disorder or peril. The answer in this case does not plead any facts to show a gift causa mortis. In a gift causa mortis the gift becomes absolute at the death of the donor, and not before. It is revocable by him at any time during life. The answer alleges simply that the decedent several months prior to his death gave the notes to the defendant, and then and there delivered them into his hands as an absolute gift which he then and there accepted. The allegations of the pleading exclude the idea of a gift causa mortis. Not only so, but the proof is insufficient to show a gift causa mortis. When Dr. Wright and Stark were there in March, Kelley was up and going about the house. He had no physician. He did not need Dr. Wright as a physician. His mind was as clear as a bell. In April he had an attack of pneumonia, but after he recovered from that in May he went off to the springs, and during the summer and fall after his return from the springs he attended to his business as usual. In the case of Duncan v. Duncan above referred to, the court, after showing that the transaction then before the court could not be sustained as a gift causa mortis, said: ''The transaction has, however, a still greater analogy to a nuncupative will than it has to either a gift inter vivos or a donatio mortis causa. It was undoubtedly the intention of the intestate that the property of the bonds in question should at his death be vested in the defendants, and this intention seems

never to have been revoked in his lifetime. As a nuncupative will, the transaction might, therefore, have taken effect, we apprehend, according to the principles of the common law. ·But, by the statute of this country concerning wills, certain requisites are made essential to the validity of a nuncupative will, no one of which has been complied with in this instance, and the transaction, as a nuncupative will, is therefore void.'' We think that this applies equally to the case before us. The testator did not relinquish control over the property in his lifetime. He made a verbal arrangement which was intended to take effect at his death, and to sustain such a transaction would be practically to enforce a nuncupative will.

The conclusion we have reached on the merits of the controversy makes it unnecessary for us to consider what notes were handed by the testator to Stark, or to pass on the question whether Dr. Wright's testimony, taken as a whole, is sufficient to show that all the notes in controversy were handed to Stark by the testator. The testimony on Stark's behalf would warrant a judgment in his favor, but for his own frank admission that he held the notes for the testator because of other conversations between them when Dr. Wright was not present.

Judgment affirmed.