## Brewer's Administrator v. Brewer.

(Decided September 24, 1918.)

## Appeal from Graves Circuit Court.

1. Descent and Distribution—Advancements—Purpose of Statute.— The purpose of section 1487 of Kentucky Statutes relating to advancements by a parent to his child was to equalize children in the distribution of the parent's estate when he did not dispose of his entire estate by will and has no application when the parent has disposed of his entire estate by will.

2. Descent and Distribution—Advancements—Will of Parent Disposing of Entire Estate—Effect of—Gifts.—Where a will has been made by the parent disposing of his entire estate a child who has received advancements from his parent can only sustain his right to hold the property upon the theory that it was a gift and not an advancement.

3. Descent and Distribution—Advancements—Gifts—Definition of— Difference Between.—An advancement as well as a gift must be irrevocable by the donor, but an advancement is a gift made with the intention that it shall be charged to the donee in the distribution of the donor's estate, while a gift is made without any purpose that it shall be thereafter accounted for.

4. Gifts—Inter Vivos—Definition of.—To constitute a gift inter vivos the thing given must be delivered to the donee and be irrevocable on the part of the donor.

5. Descent and Distribution—Advancements—Gifts—Wills —A parent in his will may control the matter of advancements and gifts, and although a thing may be given with the intention of making it an advancement, if the will disposes of the entire estate the donee can only hold it, if at all, as a gift.

6. Contracts—Statute of Frauds—Validity of Parol Contract—Parol agreement to give property in consideration of the donee removing to an agreed place or to move from one state to another or to locate at an agreed place is enforcible.

HOLIFIELD & GARDNER, G. W. ROARK and JOHN B. GRIDER for appellant.

R. E. JOHNSTON, W. H. WYMAN and W. J. WEBB for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing on original appeal and affirming on cross-appeal.

On December 8, 1911, J. W. Minton conveyed to J. E. Brewer eighty-one acres of land for the consideration of $4,750; $1,000 of this amount was paid in cash by Edmond Brewer, the father of J. E. Brewer, and he took from J. E. Brewer his note for this amount. For the balance of the purchase money J. E. Brewer exe-

cuted to Minton three notes for $1,000 each, and one note for $750, each due on or before August 1, 1912, and a lien was retained on the land to secure the payment of these deferred notes.

It also appears that in October, 1912, Edmond Brewer furnished to his son, J. E. Brewer, $400.00 in money and took his note for this amount.

In August, 1912, Edmond Brewer paid the four notes executed by J. E. Brewer to Minton, and the notes were assigned and delivered to him.

In 1912 Edmond Brewer bought and paid for seventy acres of land adjoining the eighty acres of land deeded to his son by Minton and this seventy acres was conveyed to him.

Edmond Brewer had three children; two sons, J. E. and Ottie, and one daughter, Mrs. Briley, and in his will, made in September, 1913, he gave to his son, J. E. Brewer, the seventy acres of land that he had bought in 1912; to his son Ottie $1,600 in addition "to what he has already received," and to his daughter, Mrs. Briley, and her children, he gave the balance of his estate.

After the death of Edmond Brewer, and in 1915, R. D. Moore, administrator of his estate, brought suit against J. E. Brewer on the $400.00 note, the $1,000.00 note and the four land notes executed to Minton, all of which notes were found among the papers of Edmond Brewer after his death, seeking a personal judgment on the $400.00 and the $1,000.00 notes executed by J. E. Brewer to Edmond Brewer, and to enforce a lien on the eighty acres of land to secure the payment of the four notes executed by J. E. Brewer to Minton, and assigned and delivered by Minton to Edmond Brewer.

The only credits on these notes was a payment of $200.00 on the $750.00 note, as of August 31, 1912, and credits amounting to $260.00 endorsed on the $400.00 note.

On motion to require the administrator to elect whether he would prosecute the suit for a judgment on the four purchase money notes, or the two personal notes, he elected to prosecute the suit on the purchase money notes and it was dismissed without prejudice as to the two personal notes, thus leaving in controversy in this suit only the three $1,000.00 notes, and the $750.00 note, that were a lien on the eighty-one acres of land conveyed by Minton to J. E. Brewer.

402 KENTUCKY REPORTS [Vol. 181.

By way of answer, set-off and counterclaim to the suit J. E Brewer set up that his father bought and gave to him as an advancement, the land bought from Minton and merely took and held the notes as evidence of the fact that he had advanced to him $4,750.00, the amount represented by these notes. He, therefore, sought to avoid payment of the four lien notes upon the ground that the sum represented by these notes was an advancement or gift to him.

He further set up that before the Minton land was bought he resided, with his family, in the state of Missouri, to which state his father came and prevailed upon him, by threats of disinheritance, to sell his property in Missouri and remove to Kentucky under an agreement that if he did so he, the father, would buy and give to him a farm; that pursuant to this arrangement his father did buy for him and give to him, as an advancement, the land bought from Minton, or rather the amount of the purchase price thereof; that thereafter he sold his property in Missouri and moved, with his family, to Kentucky and settled on the Minton place, where he was living at the time this suit was brought; that except for the agreement, coupled with the threats of disinheritance made by his father, he would not have sold his property in Missouri, or have removed to Kentucky. He, therefore, asked that if the notes sued on could not be charged as an advancement against him or as a gift to him that he be allowed compensation, in the amount of the notes, for the damage he had sustained by reason of the sale of his property in Missouri, and his removal to Kentucky under the circumstances stated. He further asked that the deed made by Minton, as well as the lien notes, be reformed to express the true contract between himself and his father.

After the case had been prepared for trial, the lower court adjudged that the administrator recover of J. E. Brewer the sum of $2,000, with interest from September 1, 1914, and further adjudged that the balance of the four notes sued on be cancelled, and that J. E. Brewer recover the amount so cancelled as a set-off against the notes sued on. In other words, the court, as we understand the judgment, refused to treat any of the notes as advancements, or gifts, but allowed J. E. Brewer $1,750.00 in round numbers, as damages for the failure of his father to perform the agreement under which J.

E. Brewer sold his Missouri property and removed to Kentucky by either giving to him the land or the purchase money notes.

From this judgment the administrator prosecutes an appeal, contending that he should have judgment for the full amount of the purchase money notes sued on, and J. E. Brewer prosecutes a cross-appeal contending that the administrator was not entitled to judgment for any part of the notes sued on because, as he insists, they merely evidenced the amount of an advancement or gift to him, or if he was not entitled to this relief he should have the amount of the notes as damages for the breach of the agreement under which he removed from Missouri to Kentucky.

It will be observed that in his will Edmond Brewer only gave to his son J. E. Brewer seventy acres of land, worth about $2,200.00. To his son, Ottie Brewer, he had advanced about a thousand dollars, and this, together with the $1,600.00 given him in the will, made the amount received by him about $2,600.00. He had also advanced to his daughter, Mrs. Briley, and her children, land worth about $2,500.00, and this, together with the residue of the estate, if the notes against J. E. Brewer should be collected, would make her part about $8,000.00 after the payment of the debts of Edmond Brewer. It is further shown by the evidence of the administrator that the total personal estate of Edmond Brewer amounted to $12,123, including the notes against J. E. Brewer, and that his indebtedness amounted to $8,203, leaving apparent assets $2,929.00, which could be practically exhausted by the deduction of worthless notes, the payment of the $1,600 to Ottie, and the cost of administration.

So that if J. E. Brewer succeeded in getting the eighty acres of land, worth about $5,000.00 as an advancement, and the seventy acres devised to him in the will, he would have received from his father's estate about $7,200.00, while his brother and his sister would get, approximately, about $2,500.00 each.

On the other hand, if the administrator succeeds, J. E. Brewer would get the seventy acres of land willed to him by his father, or $2,200.00, his brother, Ottie Brewer, about $2,600.00, and Mr. Briley about $8,500.00.

Leaving out of view, as incompetent, the evidence of J. E. Brewer relating to conversations and transactions with his father, we find that L. Brewer testified,

in substance, that Edmond Brewer and his son, J. E. Brewer, came to see him to get his assistance in buying a farm; that Edmond Brewer said he had come to buy his son, J. E. Brewer, a farm and intended to give it to him; that he went to Missouri to see Ed (J. E. Brewer) and to help him there, but after looking around for a while he did not like the country and told Ed if he would go back with him to Robertson county he would buy him a good home and give it to him; that Ed wanted to come to Mayfield, Kentucky, so they came down here; that he wanted a good farm to give to Ed and wanted him to help buy it; that he never had helped Ed and that he wanted to help him; that he was going to give all his children a good home; that it was arranged that Ed should execute to Minton notes for $3,750.00, but his father was to take these notes up; that they went over to the clerk's office and had the deed made and the notes written there, and after the land notes were made for $3,750.00 Edmond told Ed he wanted him to give him a note for the $1,000.00 that he was paying in cash, and so that note was written and Ed signed it. Well, then I asked Edmond why he took that note; why did he want that $1,000.00 individual note against Ed, he said: "Like the others, I want it to show in the division of my estate that I have advanced to him this $1,000.00 as well as the other $3,750.00 that the land notes will show. I want these notes to hold to show the amounts that I have advanced to him. . . ." He said: "Now, Ed, if you like the farm, and you had rather have it than where you are in Missouri, go back home and sell the farm and everything you have in Missouri as quick as you can and move down here and I will buy that farm and give it to you and it will not cost you a cent." Now after these notes were executed he told Ed he never expected him to pay these notes. He said: "You will never have these notes to pay; I am going to pay them; you will never have to pay me one cent, unless I have to have some interest. If I don't ever call for any interest you need never pay that, unless I want it." Ed told him he could never pay for the farm, and his father says: "You won't never have to pay me a cent, Ed, on that farm; it is yours. . . ." He said he wanted these notes executed pursuant to the way his father did business. In respect to the 70 acre tract he said Ed will always need it. It will make a fine pasture and I am going to buy it for him, and

he did buy it. He said he had the deed made in his name, but was going to give it to Ed. When he got ready to leave I asked him if he had made a deed to Ed for the seventy acres and he said: "No, I haven't, but I am going to; I have decided to wait until I get to Tennessee and either make him a deed or will it to him." He says: "Ed need not be uneasy, he will get the land; if I don't make him a deed I will fix it so he will get it, as I want it to go with that other piece of land—the eighty acres." Afterwards I received a letter from him with a check in it with instructions to go to the bank and pay Ed's notes and get the notes and mail them to him, which was done.

J. W. Minton said that he sold the land to Edmond Brewer for $4,750.00; that he paid him $1,000.00 in cash and for the other $3,750.00 he took the notes of J. E. Brewer, secured by a lien on the land; that in the course of the trade Edmond Brewer said that the land was to be deeded to J. E. Brewer and it was agreed then that I should take Ed's land notes, and that he would take them up to Ed and promised he would pay them all off for Ed on or before the next August; he wanted them made in four notes, so that he could take them up as he got the money. . . . When we were making the deed he said he didn't expect Ed to pay any of them. He says: "I am exacting some interest on this individual note of Ed's," but he didn't think he would ever have to call upon him for it. He said: "I want it so I can collect some interest to live on; I never expect him to pay anything on these notes, that he was giving him the farm."

C. W. Futrell testified that Edmond Brewer told him that he had bought the Minton place for his son and was going to take some notes and would charge him some interest; that he had also bought the seventy acres for him; said he was going to take some notes on account of the Minton land, and charge him a little interest to keep him from selling it.

R. C. Vincent testified that Edmond Brewer told him that he bought the Minton land for his son and had given it to him and had taken his notes so that if he ever got into trouble and needed any money he could go to him for the interest.

E. Brewer testified that Edmond Brewer told his son, when he was on a visit to his son in Missouri, that he wanted him to sell out and move to Tennessee or Ken-

tucky, and if he did not he would disinherit him; that he was going to buy his son a farm and give it to him and take his notes; that his son did not want to leave Missouri, but if he did he wanted to go to some place near Mayfield, in Kentucky; that his father said all that he wanted was interest on the money as long as he lived.

It also appears that J. E. Brewer owned twenty-five acres of land in Missouri, and that when he moved to Kentucky he sold this land, which was worth about $45.00 an acre, for $35.00 an acre, or at a loss of about $250.00.

The administrator, Moore, and others testified that J. E. Brewer, when called on to pay the notes did not claim that he did not owe them, or that his father had advanced or given to him the amount they represented, or had given him the land purchased from Minton, but said he would pay them as soon as he could, and wanted a little time.

Taking up first the question of advancement, section 1407 of the Kentucky Statutes provides that "any real or personal property or money, given or devised by a parent or grandparent to a descendant, shall be charged to the descendant or those claiming through him in the division and distribution of the undevised estate of the parent or grandparent, and such party shall receive nothing further therefrom until the other descendants are made proportionately equal with him, according to his descendible and distributable share of the whole estate, real and personal, devised and undevised."

This statute has frequently been considered by the court and it has uniformly been held that its purpose was to equalize children in the distribution of the parent's estate when he did not dispose of it by will.

But this statute can have no application to the facts of this case because Edmond Brewer, by will, disposed of his entire estate, making such disposition of it as he desired, and where a will has been made disposing of the entire estate a child who has received property from his father during his life, if no disposition of the property so received is made in the will, can only sustain his right to hold the property upon the theory that it was a gift.

It is true that in one important particular the evidence necessary to establish a gift and an advancement must be substantially the same; that is to say, in each case it must be made to appear that there was an irrevocable gift of the money or property by the donor to

the donee with the intention upon the part of the donor of terminating all right of control or dominion over the thing given. But an advancement is a gift made with the intention that it shall be charged to the donee in the distribution of the donor's estate. In other words, it is a gift in anticipation of what the donee would receive upon the death of the donor who advances to the donee a part of that, or perhaps all of that, as the case may be, that he would receive from the donor at his death, if he died intestate, with the intention that the donee shall later account for it when he comes to get his inheritable share of the donor's estate.

When, however, an ordinary gift is made there is no expectation or purpose on the part of the donor that the donee will at any time or in any way be expected to account for it, and this is the distinguishing feature between a gift and a statutory advancement.

In other words, the doctrine of advancements in this state is purely a statutory scheme to promote equality when the parent dies intestate, as to the whole or a part of his estate; but when he disposes of his entire estate by will the statutory rule as to advancements can have no application, although the parent may have said and so intended at the time the gift was made that it should be considered an advancement.

The fact, however, that the parent may have made a will disposing of his entire estate without making any mention of advancements does not in and of itself operate to convert the value of the thing given into a debt due by the child to the estate. The only effect of a will making no metion of advancements is to convert what might otherwise have been an advancement into a gift and whether the child then becomes entitled to the thing given as a gift depends on the question whether the facts and circumstances connected with the transaction are sufficient to impress the thing given with the qualities of a gift; if they are not it is a debt.

But of course the donor may, by his will, although it disposes of his whole estate, control the matter by providing that the donee shall or shall not be charged with the thing given. Accordingly it is necessary to convert a gift into a statutory advancement to be charged to and taken out of the donee's distributable share of the donor's estate that the donor should die intestate, because if he makes a complete disposition of his prop-

erty by a will the donee would have coming to him no estate undisposed of by the donor against which the gift could be charged or out of which the value of the gift could be taken in a final distribution. 14 Cyc. 165, 1 A. & E. Encly. of Law 763; Pole v. Simmons, 45 Md. 246; Nettleton v. Nettleton, 17 Conn., 542.

We are therefore of the opinion that if J. E. Brewer is entitled to these purchase money notes it must be upon the ground that they were a gift to him by his father and not a statutory advancement. As to the law upon the subject of what is necessary to constitute a gift *inter vivos* there is no difficulty or difference of opinion. The rule is as stated in Stark v. Kelly, 132 Ky. 376, that "to constitute a gift *inter vivos,* the property must be delivered absolutely, and the gift must go into immediate effect. Where future control over the property remains in the donor until his death, there is no valid gift *inter vivos.* . . . To the validity of such a gift it is essential that there should be a delivery to the donee, and that the property in the thing given should immediately pass and be irrevocable by the donor." To the same effect is Forworthy v. Adams, 136 Ky. 403; Dick v. Harris, 145 Ky. 739; Taylor v. Purdy, 151 Ky. 82.

Applying now the principle relating to gifts *inter vivos* as stated, it is apparent from the facts and circumstances that J. E. Brewer did not make an irrevocable gift of the purchase money notes or any of them to his son, or part with control or dominion over them.

It is true that there is much evidence in the record tending to show by the declarations of Edmond Brewer that he intended to give to his son, J. E. Brewer, either the land purchased from Minton or the purchase money notes that he paid off. But an unexecuted intention is not a gift. No matter what Edmond Brewer said he intended to do, the nature of the transaction is to be determined by what he did do. And looking at the matter from this standpoint we find that the Minton land was deeded direct to the son, but a lien was retained for $3,750.00 to secure the purchase money notes executed by the son to Minton, and when Edmond Brewer, the father, paid off these notes he directed that they should be and they were delivered to him, and so when he paid the $1,000.00 in cash to Minton he took from his son a note for this amount, and all these notes were retained

by him until his death and found in his papers after his death.

Under the evidence we think there can be no doubt that Edmond Brewer, if he had desired to do so, might at any time have enforced the collection of the land notes and the one thousand dollar note, whereas, if the land notes or the one thousand dollar note had been an irrevocable gift he could not have collected any part of them.

Confirmatory of our conclusion that Edmond Brewer did not make a gift of these notes to his son is the persuasive fact that when he came to make his will, about two years after the execution of the notes, he disposed of his entire estate, giving to his son, J. E. Brewer, seventy acres of land without making any mention whatever of these notes or the Minton land. It is very true that if Edmond Brewer had made to his son a perfect and irrevocable gift of these notes he might well have failed to make any mention of them in his will, although it is reasonable to presume that he would have said something about them, but as he did not give them to his son there was no reason at all why he should have mentioned them as he had them in his possession, holding them as his property, and made a complete disposition of his estate.

We think it reasonably appears from the facts and circumstances of this case that what Edmond Brewer intended to do and what he did do was to help his son buy and pay for the land rather than make to him a gift of the land or the purchase price thereof.

We are therefore of the opinion that J. E. Brewer was not entitled to either the Minton land or any of the notes executed therefor as a gift from his father.

The record does not show the grounds upon which the lower court allowed J. E. Brewer about $1,750 as a set-off or counterclaim against the land notes for $3,750.00, but it would appear from the brief of counsel for J. E. Brewer that the $1,750.00 was awarded to him as damages for the breach of the agreement made by Edmond Brewer in failing to give to his son the Minton land, by means of which agreement he induced him to sell his property in Missouri and remove to Kentucky.

The whole of this agreement, as shown by the record, is substantially this: the father said to his son in Missouri that if he would sell out there and remove to Graves county, Kentucky, he would buy for him a farm

and give it to him, and if he did not accede to this request he would disinherit him; and obedient to this request of his father, or persuaded by his threat of disin· heritance, or perhaps influenced by both, the son did sell his Missouri property and remove to Graves county, Kentucky.

On these facts it is the contention of counsel for J. E. Brewer that in the event he should not be allowed as a gift the land notes, he should have damages for the breach of the agreement under which he moved from Missouri to Kentucky, and in support of this contention the case of Berry v. Graddy, 1 Met. 555, is relied on. In that case, under facts somewhat similar to those here presented, the court held that Graddy was entitled to an enforcement of the verbal contract with Berry under which he refrained from moving his family to the state of Mississippi and located in the neighborhood where Berry lived in this state; but if it should be conceded that the contract between J. E. Brewer and his father, by which he was induced to remove to Kentucky, was a valid and enforcible agreement, we are of the opinion, under all the facts and circumstances of this case, that the agreement of his father to give him a farm in Graves county was satisfied by the devise to him of the farm of seventy acres. Under the agreement asserted by J. E. Brewer no particular farm was specified nor was any sum named that should be paid for it and so the agreement could be satisfied by the gift to him of a farm any place in Graves county. The loss he sustained in removing from Missouri to Kentucky and in the sale of his small Missouri property did not exceed a few hundred dollars, and the seventy acres of land given to him by his father compensated him in damages many times more than he could have recovered in an ordinary suit to recover the damages he sustained.

Aside from this, the conclusion we have reached with reference to both the gift and the damages is the justice and equity of this case. J. E. Brewer gets what his father intended he should have, and this is all he was entitled to.

Wherefore the judgment is reversed on the original appeal with directions to enter a judgment on the land notes for $3,750.00, with interest, and the judgment on the cross-appeal is affirmed.