## Cochran's Adm'x et al. v. Cochran et al.

(Decided March 25, 1938.)

2

W. V. EATON, C. C. GRASSHAM and L. B. ALEXANDER **for** appellants.

WHEELER & SHELBOURNE for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing in part and affirming in part.

This suit is being prosecuted by Mrs. Artha May Cochran, widow of the late W. E. Cochran, as administratrix and individually, against the children and others, to discover assets of his estate, to set aside certain conveyances and transfers made by him in fraud of her marital rights, and to settle the estate.

The decedent was a citizen of Paducah. His first wife died in the spring of 1929. In the summer of 1930, Mr. Cochran, who was then about 60 years old, met the appellant, who was about 40, at South Haven, Mich., where he and his family had spent the summers for many years. She lived in Chicago, and is a talented and refined lady. They soon became engaged to marry. She visited his home in Paducah for a few days in the early part of November, 1930, and they were married on November 27, 1930, in Chicago. Mr. Cochran's two daughters were bridesmaids. After a short wedding trip they returned to his home in Paducah. Mr. Cochran had two daughters and three sons by his former marriage, the youngest of whom was then about 19 years old. The daughters and youngest son lived with their father. The daughters married in 1933. Friction soon arose between them and their stepmother and the relations seem to have progressively grown more unpleasant. Each side has blamed the other for the unfortunate situation. Difficulties likewise arose between Mr. and Mrs. Cochran, apparently through the children's influence. It was not long after their marriage that he consulted his old friend and counselor, Hon. Charles K. Wheeler, who advised him that he had no cause for divorce, and cautioned him in certain particulars so that he should not give his wife such cause. About the 8th of August, 1933, Mr. Cochran went to Pine Bluff, Ark. This was after a statute had been enacted by that state authorizing the granting of a divorce to one who had resided there for 3 months. On October 10, following, he filed a suit for divorce, alleg-

ing as grounds, in substance, his wife's fussy disposition, bad temper, and cruel treatment. Mrs. Cochran, summoned as a nonresident, filed answer and a cross-complaint as an independent action seeking maintenance or alimony. Before the case was submitted for judgment, Mr. Cochran died at Pine Bluff, on February 14, 1934. Two of his sons were with him, but none of the family advised his wife of his death. She learned of it through her attorney and the newspapers.

The widow qualified as the administratrix of the estate and found only her husband's personal effects and a little furniture not claimed by the daughters, all of which was disposed of for about $500. This suit was soon filed by her both as administratrix and individually, but the court ruled that she could not maintain it in such dual capacity. Electing to continue the suit as administratrix, she filed answer and cross-petition individually against the children and others, setting up substantially the same allegations and prayers as in the petition. The court overruled a demurrer to this pleading.

There were many and somewhat involved pleadings and a large amount of testimony taken by depositions. During the progress of the case, some assets were discovered and brought into the estate, concerning which there ceased to be any controversy. There is reason to believe that there were other assets not uncovered. Thus a sealed and carefully preserved envelope delivered by the proprietor of the Pine Bluff Hotel, where Mr. Cochran had been staying, to one of his sons, but addressed to a daughter whom subsequent disclosures show to have been most active, was said to have contained nothing but a trial balance of one of the companies Mr. Cochran was interested in and some old letters; and the appraisers were denied access to the safe and bank safety box in the name of that daughter and to which he had the right of access. Certificates of stock in one company at least were never produced.

The chancellor refused to set aside all conveyances and transfers of property made by the decedent as they affected her marital rights, except a deed to nine parcels of Paducah real estate. The widow, as personal representative and individually, prosecutes an appeal from the judgment adverse to her, and the children have a cross-appeal from that part of it which gives

her dower in the Paducah property covered by the deed mentioned.

The parties are in agreement on only one point and that is that there was much incompetent and irrelevant evidence. The trial court overruled exceptions to the depositions, but stated in his judgment that he had considered only what was competent. Some complaint is made of this by the parties. The cross-appellants also question the ruling on their demurrer to the answer and cross-petition of Mrs. Cochran. We will not undertake to pass upon these questions specifically, but shall go direct to the issues of fact and the rights of the parties as presented by the whole record. In doing so, we shall consider only the competent and relevant evidence, supported by pleadings we deem good.

The general principle is that advancements or gifts to children, reasonable in relation to the amount of property owned, made in good faith and not to defraud a wife or a prospective wife, afford no grounds of complaint by her. But in this state proof of gifts or voluntary conveyances and transfers of all or the greater portion of a man's property, made without the knowledge of the wife or intended wife, presents a prima facie case of fraud upon her marital rights. Unless satisfactorily explained away by the recipients or beneficiaries, such conveyances and transfers are not binding upon the wife, and equity will require a proper accounting and restoration to the widow of her rights of which she has been fraudulently deprived. Leach v. Duvall, 71 Ky. 201, 8 Bush 201; Murray v. Murray, 90 Ky. 1, 13 S. W. 244, 11 Ky. Law Rep. 815, 8 L. R. A. 95; Manikee's Adm'x v. Beard, 85 Ky. 20, 2 S. W. 545, 8 Ky. Law Rep. 736; Wilson v. Wilson, 64 S. W. 981, 23 Ky. Law Rep. 1229; Cooke v. Fidelity Trust & S. Vault Company, 104 Ky. 473, 47 S. W. 325, 20 Ky. Law Rep. 667; Goff v. Goff's Ex'rs, 175 Ky. 75, 193 S. W. 1009; Rudd v. Rudd, 184 Ky. 400, 214 S. W. 791; Anderson v. Anderson, 194 Ky. 763, 240 S. W. 1061; Payne v. Tatem, 236 Ky. 306, 33 S. W. (2d) 2.

The statement that Mr. Cochran had early consulted and received the advice of his counsel was made by him in answer to interrogatories submitted in the Arkansas divorce proceedings, the record of which was filed in this case. He therein also stated that he then owned property to the value of only $6,065, and that on November 27, 1930 (the date of the marriage), the

value of his personal property was $24,625. He made no reference to the trust deed to the Paducah property, or the retention also for life of the benefit of certain stock, to which we shall refer. Two days before he answered the interrogatories Cochran sent to his cousin, John S. Long, in Louisville, two $1,000 bonds called for payment December 1, 1933, which he asked Long to have redeemed in his name. He asked that he secure currency for the bonds, place it in his safety box, and hold for him, the writer. He also sent by express a lot of bonds, certificates of deposits, notes and stock certificates, which were listed, of the aggregate face value of $44,799, with instructions that Long place the same in his safety box in the name of Mrs. Long, with the privilege of Mr. Long entering the box. The appraised value of these securities was about $28,000. The day after the burial, Mr. Long was visited by James C. Cochran and Mrs. Lydia C. Burnett (son and daughter), who looked in these papers for their father's will. James and George Cochran came a few days later, and the former demanded of Long that he give up the securities which had been sent him by his father. Mr. Long advised them to have an administrator appointed, to whom he would turn over the securities. He was never advised that the widow had already qualified as administratrix. Later Mr. Long filed suit setting up his possession of these securities and cash, and asked the advice of the court in respect to their disposition. Under a judgment they were delivered to the appellant, as administratrix.

With much difficulty it was developed that several companies in which Mr. Cochran held stock received letters bearing date of February 13, 1934, requesting that future correspondence relative to the stock should be sent to "Postoffice Box 64, Frankfort, Kentucky, which will be my permanent address." These letters had the name "W. E. Cochran" signed on the typewriter only. It was proved that they were written on the machine at the office of W. E. Cochran and his son, George Cochran. On February 13th Mr. Cochran was in a Pine Bluff hospital in a dying condition and of course did not write them. One of these letters addressed to a firm in Chicago was received there on February 20th. The delay and circumstances indicate that this one at least was written after Mr. Cochran's death. The office secretary's memory failed when asked what she knew

about these letters. All five of the children testified that they knew nothing whatever about them. So every one who had access to the typewriter or who would have a natural interest avowed their innocence. Likewise as to the retention of the Frankfort post office box. The children had an aunt living in Frankfort, and, while very evasive concerning this post office box, she finally admitted she had made the arrangements for some of the children and that she had received and opened the mail addressed to Mr. Cochran, some of which contained dividend checks. All of this mail was turned over to Mrs. Mildred C. Stiles, one of the daughters, and the widow and administratrix was kept in ignorance of what was going on.

These and some other transactions are important now only as showing the attitude of both the husband and the children and as supporting the appellant's insistence that there was formed soon after her marriage, and existed at all times, a united purpose to deprive her of her marital rights in her husband's property. They are persuasive in the consideration of the transactions particularly involved in this appeal.

Not only this, but, when the depositions of the five children were taken as on cross-examination, in every instance when they were asked by the appellant's counsel concerning a conversation or transaction in which their father was even remotely involved, or as to their knowledge of his affairs, both before and after his death, they refused to answer upon advice of counsel. The court compelled some answers as to subsequent affairs and acts of their own, but the witnesses testified to knowing little or nothing. In a similar situation, we wrote in Guthrie v. Foster, 256 Ky. 753, 76 S. W. (2d) 927, 932:

> "He was thus afforded the privilege and opportunity to avail himself of his own testimony which he declined to accept; consequently the court must determine the decisive questions herein without the enlightening and helpful benefit of his testimony. His refusal to answer the question and thereby impart to the court his personal knowledge of the decisive facts is a circumstance from which it is allowed to be inferred that, if he had answered the question, his answer would have established a partnership between him and Foster. Star Mills v. Bailey, 140 Ky. 194, 130 S. W. 1077, 140 Am. St.

Rep. 370; Rice v. Rice, 243 Ky. 837, 50 S. W. (2d) 26. It is an established rule that, if a party is incompetent as a witness 'for himself concerning any verbal statement of, or any transaction with, or any act done or omitted to be done' by one who is dead when the testimony is offered to be given, and is called as a witness by the adverse party and he testifies in behalf of the party calling him, his incompetency is thereby removed, and he may thereafter testify as to those matters concerning which he was interrogated. Arnold et al. v. Cocanaugher et al., 170 Ky. 712, 186 S. W. 488; McCoy v. Ferguson, 249 Ky. 334, 60 S. W. (2d) 931, 90 A. L. R. 891; Black v. Noel's Adm'x, 240 Ky. 209, 41 S. W. (2d) 1100. The calling of R. R. Guthrie as on cross-examination and affording him an opportunity to avail himself of his own testimony was indeed greatly to his benefit, and his refusal to answer the question and thus furnish the facts to the court weighs heavily against the insistence no partnership existed between him and John J. Foster.''

On July 7, 1931, there was placed of record a deed from W. E. Cochran to his son, George A. Cochran, as trustee, for the benefit of himself and the four other children, of nine parcels of real estate, being all that W. E. Cochran owned in Paducah. Its appraised value was $21,430. The trustee was empowered to sell and convey the property with the consent of the grantor, the proceeds to be placed at interest; and on the death of W. E. Cochran the entire property was to be divided among the five children. The deed bears date of September 23, 1930, and was acknowledged before the Cochrans' stenographer as a notary public. It will be observed that the date was about 2 months before the marriage, but the recording was about 7½ months after marriage. Though no attack is made upon the officer's certificate, the date which the deed bears is brought under suspicion. The notary did not testify as to the date on which the deed was written or acknowledged, though she gave her deposition relating to other subjects. The grantor continued control of the property and it continued to be assessed for taxes, both in the city and county, by him in his own name. Included in the conveyance was the family residence. This property was originally conveyed to the first Mrs. Cochran in 1912. After her death (the date not being shown) the five children conveyed it to their father. In April

or May, 1931, Cochran employed attorneys to bring suit against himself for his daughter Lydia Cochran to have the deed made by her set aside because she was an infant at the time she executed it. On May 15, 1931, a default judgment was rendered. Though the judgment directed W. E. Cochran and his wife to reconvey the one-fifth interest in the property to his daughter by June 15, 1931, he did not do so. He permitted the deed to be made on that date by a special commissioner of the court, although additional expense was thereby incurred. This procedure had the advantage of securing the transfer of the title without the knowledge of his wife. If the deed to George A. Cochran was in fact executed September 23, 1930, it is remarkable that he was not made a party to the suit, although he held title when it was brought. No reference whatever to the trust deed was made in the suit. The chancellor adjudged that this entire conveyance was a fraud upon the wife's marital rights in the whole of the property except the undivided one-fifth interest in the home owned by the daughter Mrs. Lydia C. Burnett. The cross-appeal is from this part of the judgment. The argument, however, is directed exclusively toward the inclusion of the residence property. It is submitted that this had come through the children's mother. There is no competent evidence that it was paid for by her in 1912 when it was deeded to her. But, whatever may have been its origin, the title was in the father before his marriage to the appellant. The court, therefore, properly included it in the judgment awarding the widow her legal rights in it.

The deceased owned two cottages in South Haven, Mich., each of which was worth about $4,000. Both were conveyed to David A. Yeiser, of Paducah, by a deed which Mrs. Cochran signed on May 30, 1931. We disregard as incompetent her evidence of conversations with her husband and her agreement to sell one of the cottages and keep the other, and that she was so hurried and harassed at the signing of the deed that she was not permitted to read it and did not know it conveyed both pieces of property. Yeiser testified that Mrs. Cochran read the deed and, when she said, "I want to understand this," Mr. Cochran said something to the effect that, "It is a deed to the Michigan property that I have been talking to you about." Yeiser further related that he was buying only one of the cottages, but

Cochran had asked him to include both of them in his deed and then for him to reconvey the one he was not acquiring to his daughter because a deed from a parent to a child was not valid in Michigan unless it went through a third party. ' Yeiser thereupon promptly reconveyed that property to the daughter Mildred L. Cochran, now Mrs. Stiles. It was proved that the statement as to the Michigan law is untrue. The recited consideration in the deed from Cochran to Yeiser is "$100. and other valuable considerations." The true consideration was the conveyance by Yeiser of a lot on Broadway in Paducah and the execution of a note for $3,816 to W. E. Cochran. Yeiser testified that just before Cochran went to Arkansas he spoke to Cochran about his note and told him that it was not convenient to pay it, and suggested that he would deed back the Michigan property and lose what he had paid on it. Cochran said he would not push him on the note and would cancel the interest. He also told him, "I have disposed of the note," and, when Yeiser asked to whom, he replied, "You need not worry about that, for the party understands you are not going to be able to pay it and you will not be pushed." Cochran refused to tell him who had the note, saying, "You will be dealt with all right; don't worry about that." Quite awhile after Cochran's death Yeiser paid the note to George A. Cochran without interest. He paid it in currency, took the note, and destroyed it. The Broadway lot conveyed to the daughter, on May 30, 1931, was listed for both city and county taxes as of July 1, 1931, by Mr. Cochran as his own property. It was also listed as his in 1932. After that it was listed as belonging to Mrs. Stiles. She testified as on cross-examination that she had never had possession of the deed, but knew that the property had been conveyed to her. She declined to answer when she learned of that fact. She testified that the deed was at the courthouse and she did not know who had had it recorded or who had returned the property for taxation. She declined to answer whether she had paid any consideration for the property. It does not appear when this deed was placed of record.

George A. Cochran was not asked anything about the note. His dealings with Yeiser would certainly have been competent. It appears that he was indebted to his father at the time of his death on an old note with which he has been charged $4,854.34 in the judg-

ment. It has no relation to this transaction, but it would be quite unusual if the son had purchased this Yeiser note for a valuable consideration while so indebted to his father.

We think the court correctly held that as to the transfer of the Michigan property Mrs. Cochran, having signed the deed, could not be heard to complain. But as to the consideration for that conveyance the situation is different. She had the right to assume that the consideration would go into her husband's estate and not be given away to his children. The transaction is covered by badges of fraud. The burden was cast upon the recipients of the property to show the good faith and regularity of the transactions. It was fraud on the wife to convey the Broadway lot to the daughter and to give the note to the son. We are of the opinion that the court should have recognized the widow's rights and required an accounting to her as to both items.

There were some other transactions of a very suspicious nature, such, for instance, as the recording of three deeds bearing date of June 10, 1931, from W. E. Cochran, as attorney in fact, for the heirs of Joseph K. Exall to Mildred Cochran of certain property on Monroe street in Paducah. This was returned for taxation as of July 1, 1931, as the property of W. E. Cochran. However, there is little evidence concerning this transaction and no reference to it is made in the judgment, and little or no contention respecting it made here by the appellant. Stock in "Exalls Orchards," a corporation, was found pledged to secure a $4,000 note at a bank.

Mr. Cochran was the owner of 264 shares of stock in the Princeton Hosiery Mills which had a book value of $140 a share when he died. He and two others owned practically all the stock in the company and he was for awhile its president and later the secretary. After his death, the children claimed that this stock had been given to them by their father. They relied upon two letters as substantiating the gift, one of those letters is as follows:

"Paducah, Kentucky,
"July 1st, 1930.

"Mr. Geo. G. Harralson,
"Princeton, Kentucky.

"Dear George:
"As you know I have not been feeling well re-

cently and in fact I am rather uneasy about myself and as I am leaving in a few days for Michigan for the Summer as Doc has advised me that the change might straighten me out. But feeling as I do, I have arranged a disposition of my property instead of making a will and the stock I own in the Mill I have given and transferred the stock certificates in the Mill as of June, 30th-1930 as follows:

| | |
|---|---|
| Mildred Lang Cochran............... | 100 shares |
| Lydia W. Cochran .................. | 99 shares |
| George A. Cochran ................. | 6 shares |
| John L. Cochran ................... | 52 shares |
| James O. Cochran .................. | 4 shares |
| | 261 shares |

"Leaving 3 shares of stock in my name—

"Regards to all at mill.

    "Yours,

              "W. E. Cochran."

The other is as follows:

           "Paducah, Kentucky,
           "July 1, 1930.

"Mr. Geo. G. Harralson,
"Princeton, Kentucky.

    "Dear Mr. Harralson:

    "You will recall that our father has told you that he had given and transferred all of his stock in the Princeton Hosiery Mill, except three shares of stock that he has retained for himself, to us children—as follows:

| | |
|---|---|
| Mildred Lang Cochran, | 100 shares |
| Lydia W. Cochran, | 99 shares |
| John L. Cochran, | 52 shares |
| Geo. A, Cochran, | 6 shares |
| James O. Cochran, | 4 shares |
| No. shares to be changed | **261** shares |
| W. E. Cochran still holds | 3 shares |
| Total | 264 shares |

    "It is our desire that our father continue to draw the dividends, if any, on the stock transferred to us for the present, or until you are advised to

the contrary by us. We have the stock certificates duly signed and transferred to us by father.

"Very respectfully,

"Mildred Lang Cochran
"Lydia W. Cochran
"John L. Cochran
"George A. Cochran
."Jas. O. Cochran."

The company's records contain nothing to show when these letters were received. Mr. Harralson did not undertake to say when they were received but stated they were handled as other mail. There was no notation on the stock register concerning these letters. The stock was never transferred although, as secretary of the company, Cochran had the right and opportunity as well as the duty to the company and the donees to make the transfers if they were real. The certificates were never canceled nor new ones issued in their stead to the children. Cochran continued as an officer of the company. He received the dividends and voted the stock at the subsequent meetings. None of the children attended the stockholders' meetings. All of the children refused to answer persistent questioning by the plaintiff's counsel, in taking their deposition as on cross-examination, concerning this alleged gift. In their depositions given in chief, Mrs. Stiles stated that she had had a certificate in her possession once but refused to tell what she had done with it. Further along she testified that she had seen the certificates in the possession of her father. She remembered nothing at all about having signed the letter to Mr. Harralson. Mrs. Lydia C. Burnett had seen the certificates at home when her father had them and when only the two were present. She knew nothing about the possession of the certificates. John Cochran saw the certificates in the possession of his father when only the two were present. James Cochran stated that his certificate of nine shares was in the possession of his brother George. George Cochran testified that he had all the certificates in his possession for safe-keeping but refused to tell when he obtained them. The appraisers of the estate, as we have stated, were for several days denied access to the decedent's safe in the control of this son. The defendants placed in the record photographs of the nine certificates of stock representing the interests involved.

The assignments or transfers on the back show the names of the respective children as transferees. Each is dated June 30, 1930, and witnessed by Cochran's stenographer. Whether the names of the children as transferees are in ink or typewritten does not appear, as only copies are before us. The evidence shows that Mr. Cochran's signatures were in pencil. A teller of the bank, of which Mr. Cochran was a vice president, testified that it is and was almost an invariable custom when certificates of stock are pledged as collateral security for the owner to sign the transfer in pencil.

It is the contention of the appellant that the assignment or gift of the stock was a sham and that the letters to Mr. Harralson, bearing date of July 1, 1930, which was before Mr. Cochran met his future wife, were actually written and the scheme concocted about July 1, 1931. There is much to sustain this view. Other than the failure of Cochran to transfer the stock on the books of the company and his continued activities as a stockholder, director, and officer, there are some unusual circumstances in the letters themselves. They are addressed to Mr. Harralson, personally, and not as president of the company. There was no reason for such letters to be written if the gift was bona fide and completed. No other person was interested in the transaction on July 1, 1930. The letter signed by the children bearing the same date starts out, "You will recall that our father has told you that he had given and transferred all his stock," except three shares, to the signers of the letter. There was no need to stir Harralson's memory of what was being simultaneously done. There is much more than this. It is not shown that Mr. Cochran had not been feeling well or was uneasy about his health about July 1, 1930. But on July 27, 1931, he had his secretary write to his wife, who was then visiting in Chicago, that on the advice of his doctor he had gone to Martinsville, Ind., for his rheumatism and that he was in a very bad condition and not improving rapidly. On August 1st, the secretary, in response to her inquiry, advised Mrs. Cochran her husband's address in Martinsville. The transfer of this stock on or about July 1, 1931, would be in harmony and sequence with other transactions which were occurring about that time. On June 19, 1931, Cochran consulted his lawyer about obtaining a divorce. In May, 1931, he arranged the suit by his daughter to set aside her deed of her

interest in the residence, and on June 15, 1931, he let the court's commissioner make her a deed, thereby keeping his wife in ignorance. On May 30, 1931, he gave his Michigan property or the sale price to two of his children. On June 10, 1931, there is the mysterious conveyance of the Exall property to his daughter. On July 7, 1931, he placed of record the deed to all his Paducah property to his son as trustee. Thus, about July 1, 1931, Cochran was stripping himself of all his estate except the securities which he sent to Mr. Long just before giving his deposition in the Arkansas divorce case.

It is true that the transfer of stock on the books of the company is regarded as being for its protection and that a contract of sale passes the rights in the stock to the vendee. Citizens' Bank of Shelbyville v. Mutual Trust & Deposit Co., 206 Ky. 86, 266 S. W. 875, 40 A. L. R. 1001. But we are dealing here with a claimed gift inter vivos and it must be remembered that in the particular case the burden rested upon the claimed recipients to establish that there was an actual and completed transfer of the property as represented by the certificates.

A husband may not deprive his wife of her distributable share in his estate by will, effective on his death. Neither can he do so by a transfer of his property before death by a gift in the nature of a testamentary device, retaining the benefits and control during his life. To permit that would allow him to do indirectly what he cannot do directly. In Stark v. Kelley, 132 Ky. 376, 113 S. W. 498, 500, we declared:

> "To constitute a gift inter vivos, the property must be delivered absolutely, and the gift must go into immediate effect. Where future control over the property remains in the donor until his death, there is no valid gift inter vivos. * * * 'To the validity of such a gift it is an essential that there should be a delivery to the donee, and that the property or the thing given should immediately pass and be irrevocable by the donor.'"

In Foxworthy v. Adams, 136 Ky. 403, 124 S. W. 381, 27 L. R. A., N. S., 308, Ann. Cas. 1912A, 327, the court said:

> "To constitute a valid 'gift inter vivos,' there must be an absolute transfer of the property from the

donor to the donee taking effect immediately and fully executed by a delivery by the donor and accepted by the donee, and a gift to take effect after the donor's death, the donor in the meantime retaining the control of the property, is not a valid gift.''

In Bowles v. Rutroff, 216 Ky. 557, 288 S. W. 312, 313, we held:

"As the bank stock was never delivered either to the infant or to any one for him, or transferred on the books of the bank, but the control and possession thereof remained in the donor, there is no escape from the conclusion that the transfer was not effective as a gift inter vivos.''

In Biehl v. Biehl's Adm'x, 263 Ky. 710, 93 S. W. (2d) 836, 837, we again hold:

"A 'gift inter vivos' is one between living persons to operate, if at all, in the donor's lifetime, immediately and irrevocably. 'It is a gift executed. No further act of parties, no contingency of death or otherwise, is needed to give it effect.' See Robson v. Robson's Adm'r, 3 Del. Ch. 51, 62; Moore v. Shifflett, 187 Ky. 7, 216 S. W. 614; Foxworthy v. Adams, 136 Ky. 403, 124 S. W. 381, 27 L. R. A. (N. S.) 308, Ann. Cas. 1912A, 327; Reynolds v. Thompson, 161 Ky. 772, 171 S. W. 379; Stark v. Kelley, 132 Ky. 376, 113 S. W. 498; Dick v. Harris' Ex'r, 145 Ky. 739, 141 S. W. 56; Brewer's Adm'r v. Brewer, 181 Ky. 400, 205 S. W. 393; Smith's Adm'r v. Smith, 214 Ky. 785, 284 S. W. 83. Such a gift is not complete without a delivery. Cincinnati Finance Company v. Atkinson's Adm'r, 235 Ky. 582, 31 S. W. (2d) 890. See cases, supra. A written instrument purporting to make a gift of personal property, such as notes, stocks, or bonds, is ineffectual to pass the title when there was no delivery actual or constructive by the donor of either the writing or the property and no acceptance by the donee. Payne v. Powell, 5 Bush 248; Bowles v. Rutroff et al., 216 Ky. 557, 288 S. W. 312, 313.''

In Moore's Adm'r v. Edwards, 248 Ky. 517, 58 S. W. (2d) 915, 919, we declared:

"Gifts first asserted after death of the donor are regarded with suspicion and must be established by clear and convincing evidence, particularly where

the relations are such as existed here. In such cases the courts will closely scrutinize the transaction claimed to constitute the gift. Anderson's Adm'r v. Darland, 192 Ky. 624, 234 S. W. 205; Combs v. Roark's Adm'r, 221 Ky. 679, 299 S. W. 576.''

We further held in that case that the presumption of fraud arises more readily in case of a gift inter vivos than of contract.

Mr. Justice Story said that, in order to prove a charge of fraud and conspiracy committed by a dead man—''to make men sin in their graves''—the proof must be beyond reasonable doubt. Gould v. Gould, 3 Story, U. S., 516, 10 Fed. Cas. p. 864, 873, No. 5637. Though such expressions have been frequently used by the courts, they but state the idea which means no more than that the proof must be such as to create belief and not merely suspicion. In this case, through the elimination of most of the widow's testimony by the restrictions of section 606 of the Civil Code of Practice, she is not heard; and, though her husband's lips are sealed by death, she provided a means for an explanation of all these transactions by the other participants and they declined the opportunity. We may apply Lord Mansfield's maxim concerning the weight of evidence, viz., ''All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted.'' Blatch v. Archer, 1 Cowp. 63, quoted in Kirby v. Tallmadge, 160 U. S. 379, 16 S. Ct. 349, 40 L. Ed. 463. It is a well-settled rule that, where the evidence tends to prove a material fact which imposes liability upon a party who has it within his power to produce evidence of facts as they existed and he neglects or refuses to offer such proof, the natural conclusion is that, if produced, instead of rebutting, it would support the inference against him and support the case of his adversary. When conduct apparently suspicious or dishonorable is the subject of investigation and an actor has opportunity to explain it and interest in doing so yet fails or refuses, the effect of the rule is so much the stronger. Moore on Facts, sec. 574. The defendants' silence weighs heavily against them. Their refusals argue their culpability.

Marshaling the entire proof, with all its ugly inferences, and being guided by the several rules and con-

cepts of the law above stated, we think that the evidence as to this claimed gift of stock as well as the other transactions concerning which we have already stated our conclusions shows that a gross fraud was committed upon the marital rights of the appellant and that the court should have so. adjudged. Indeed, in all the published records of this court there does not appear a purpose more palpable or a case more aggravated. When Cochran married, he was well worth over $100,C00. When he died, three years later, only his personal effects of negligible value constituted his visible estate.

The judgment is reversed on the appeal, with directions to enter another conforming to the opinion. The judgment is affirmed on the cross-appeal.

Whole court sitting.