## Rudd v. Rudd, et al.

(Decided May 27, 1919.)

### Appeal from Pendleton Circuit Court.

1. Gifts—Fraud—Action to Set Aside.—The father has a right to give property to his children during the marriage relation, but, when it is made for the purpose of defrauding the wife, the gift will be set aside as far as it affects her interests.

2. Executors and Administrators—Executor De Son Tort—Gifts.—One who takes property, under a writing in the nature of a testamentary disposition, but, which on account of its execution is not valid as a will, and the property, therefore descends to the heirs of the one delivering the property, and after his death the party receiving it from the decedent, undertakes to distribute it in accordance with directions of the decedent, becomes an executor de son tort.

3. Executors and Administrators—Executor De Son Tort.—One who holds property under a fraudulent assignment of a decedent, is an executor de son tort.

4. Executors and Administrators—Executor De Son Tort.—An executor de son tort is held to all the liabilities of a real personal representative, without any if the rights, which attach to such an office.

5. Husband and Wife—Gifts.—A husband has a right to make the wife a gift, where the rights of creditors are not prejudiced.

6. Constitutional Law—Imprisonment for Debt.—There is no provision of either the Federal Constitution, or of the State Constitution, which prohibits imprisonment for debt.

7. Judgment—Contempt—Validity of Order Which May be Punished by.—To make a valid order, the disobedience of which may be punished as a contempt, it is necessary that the court have juris-

diction of the parties, the subject matter of the action, and the power to make the order, and the order must be within the issues of the action.

8. Judgment—How Enforced.—Judgments at law, in personam for the recovery of money, may be collected by a writ of fieri facias, by virtue of which the person of the defendant can not be taken, but, if the judgment is for a trespass, vi et armis, seduction, slander or malicious prosecution, and not against a woman, a writ of capias ad satisfaciendum may issue, by which the person of the defendant may be seized and imprisoned, until discharged under the provisions of section 2180, Ky. Stats.

9. Judgment—How Court of Equity May Enforce.—Courts of equity may enforce their orders and decrees by any appropriate writ, allowable at law, or by attachment and imprisonment for contempt in disobedience of its orders.

10. Judgment—Attachment to Enforce Judgment—Equity.—As a general rule, a court of equity will not enforce an order or decree for the payment of money, by attachment and imprisonment, except as against a fiduciary, or one occupying a position of trust, where a fund is the subject of the litigation, and the possessor of it is under the control of the court, or as against the officers of the court, and will not grant an attachment to enforce a judgment for a debt or claim upon assumpsit, or a contract.

11. Attachment—To Enforce Payment of Money—Equity.—As a general rule, a court of equity will not grant a writ of attachment to enforce the payment of money against one, who is unable to make payment, because of no fault of his, but inability to pay will not excuse a fiduciary from a contempt who is unable to pay, because he has misappropriated or misapplied the trust funds.

W. A. BYRON and A. D. COLE for appellant.

M. HARGETT for appellees.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

On November 11, 1913, Joseph Rudd, a widower, and Belle French, a widow, married, and continued as husband and wife, until January 20, 1916, when the husband died. He was seventy-six years of age, at the time of his death, and, by a former marriage, was the father of seven children, who were living, and two, who were dead. Each, of the latter, left a number of children, surviving him. The living children of Joseph Rudd, were all mature persons, and some of them had passed the middle of life. The widow, Belle French, owned a small farm, upon which she lived. She owed a note, for the sum of $400.00, which seems to have been a lien upon her land.

A few hours before the marriage, Joseph Rudd called upon the holders of the note against his intended wife, and paid off the note, and, either before or after the marriage, made a present of it to his wife. After the marriage, they lived at the home of his wife, who had a young son by her former husband, and this young son, yet, lived with his mother. The place at which Joseph Rudd and his wife lived, was in Pendleton county, and two of his sons, Abner Rudd, and Bela Rudd, lived in the vicinity of Brooksville, in Bracken county. Joseph Rudd would make trips to Brooksville nearly every month, and, on one or more occasions, stayed several days before returning to his home. In December, 1915, he left his home to go to Brooksville to secure the services of two physicians at that place, and while there, stopped at the home of a niece, and, also, came in contact with his son, Abner Rudd, and visited his home. He became more ill after reaching Brooksville, and died at the home of his niece, at that place. No notice, was given to his wife, of his sickness, death or burial, until five days afterward, when Bela Rudd visited the home of his father's widow, and gave her information about it. Joseph Rudd, at the time of his death, did not own any property, except about $100.00 in value of household goods, which were at his home, and $1,675.00 in money and notes. The widow and administrator, learned, after a time, that the money and notes were, at the decedent's death, in the hands of his son, Abner Rudd, or at least, they had been delivered to Abner Rudd, by the decedent shortly before his death.

The administrator, the widow and one of the daughters of decedent, who had not been permitted to share in the distribution of his property, brought this action against Abner Rudd and the other heirs of decedent, and sought the recovery of the money and the proceeds of the notes, and for a distribution of same among the widow and heirs, in accordance with their legal rights. They alleged, that Abner Rudd had secured the money and notes under an arrangement with the decedent, and had kept the greater part, himself, but, distributed portions to others of the defendants in fraud of the rights of the widow, and the other heirs of the decedent, who at the time of the transaction between him and Abner Rudd, by which the latter secured the possession of the money, was so infirm and imbecile, that he did not know the quality of his actions, and was procured to deliver the possession

of his property to Abner Rudd, by an undue influence exercised over him, by Abner Rudd. They, also, claimed, that Bela Rudd had, in the same way, secured a note, which he owed the decedent, for the sum of about $300.00. The defendants, the appellants here, relied for a defense, to the action, upon a paper, subscribed by the decedent and Abner Rudd, which bore the date of December 6, 1915, and recited, that in order that his six children should receive a just and equal portion of his estate, at his death; that he had appointed Abner Rudd as his agent and turned over, to him, all of his money and notes, the latter of which he had endorsed, and which were to be collected by Abner Rudd, but, all of it should be subject to the control and demands of decedent, during his life-time, but, after his death, Abner Rudd should pay the costs of his burial and other expenses out of the money, and divide the remainder between decedent's six children. Joseph Rudd and Abner Rudd, each, subscribed the paper by mark. Although the decedent, at that time, had seven children living, the paper recited, that the property was to be divided between his six living children, and did not designate which ones of his children should constitute the six children among whom the money was to be divided, and although he had a number of grandchildren surviving him, who were the children of his two deceased children, there was no provision made, nor mention of them, in the writing. And, although, according to Bela Rudd, he had theretofore, given him a note, which he held against Bela Rudd, for the sum of $300.00, it is claimed, that Bela Rudd was entitled to be one of the six children to receive an equal portion of the remainder of the estate. For a further defense, the appellants relied upon a contract in writing, which was subscribed by the widow, and by Rudd, as agent of Joseph Rudd's heirs.

This paper was subscribed on the 25th day of January, 1916, at the time, when Bela Rudd informed the widow of the death and burial of her husband, and the paper recited, that the widow in consideration of retaining the personal effects of her husband, which were in her possession, except his trunk and pictures and the contents of the trunk, relinquished all claim to any of his personal effects in Bracken and Pendleton counties, and Bela Rudd, for the heirs of decedent, agreed to pay all the burial expenses, and all debts, which the decedent

owed. This contract was plead as an estoppel of any claim of the widow for her distributable share of the estate or any claim as the widow of the decedent. The widow sought to avoid this contract, upon the grounds, that its execution was without consideration, and was obtained from her, by misrepresentation and fraud.

It should be stated, that the same person, who was the draftsman of the writing between Abner Rudd and the decedent, and which was executed at Brooksville, accompanied Bela Rudd to the home of the widow, in Pendleton county, and there, prepared the writing, which was subscribed by the widow and Bela Rudd for the heirs of Joseph Rudd. Under the contract between Bela Rudd and the widow, she only retained of her husband's estate, certain articles of bed clothing, and probably, a few other household articles of comparatively small value. The only thing of any value in the house of the widow, was a mortgage, for the sum of $150.00, payable to the decedent, and secured by a lien upon a horse and mule, and this, Bela Rudd obtained under the contract, and carried away with him, but it seems thereafter to have gone into the hands of Abner Rudd. After hearing the evidence offered in the case, the court sustained a motion for a rule against Abner Rudd, to show cause why he should not pay into court the sum of $1,701.75, as the money received from his father, Joseph Rudd. To this rule, he responded, that he received from his father, only the sum of $1,551.75 in trust, to pay it in equal amounts to the six children of decedent, namely, Bela Rudd, Webb Rudd, Isaac Rudd, Julia Rudd, Lizzie Rudd and himself, and that he had, long since, executed the trust, by retaining one-sixth of it himself, and paying one-sixth of it to each of the others named, and that he had made this division after the payment of the burial expenses and other expenses incident to the sickness of his father, and that he did not have the money then in his possession, or under his control, and that the only money, he had in his possession, was $1,500.00, which he had received as the price of a farm, which he had sold, and which was his homestead. The response was adjudged, insufficient, and the rule made absolute, and he was adjudged to be in contempt of the court, and that he could purge himself of the contempt, by paying into court, the sum of $1,182.76, and an order of an arrest was directed to be issued, and the officer directed to execute it, by arresting him, and

delivering him to the jailer of the county, but provided, that he could discharge himself by paying the sum ordered to be paid or he could give bail, in the sum of $1,500.00 conditioned, that he should appear in court on the first day of its following term, and pay into court, the sum of $1,182.76, and to this judgment, Abner Rudd excepted, and appealed from it. A considerable quantity of evidence had been taken upon the issues of the case, and it was apparently ready for submission, when the order was made, directing Abner Rudd to pay to the master commissioner of the court, the sum above named. The court did not adjudge that the rule should be absolute, until a response had been filed to it by Abner Rudd, and he was ordered to pay over the money, and adjudged to be in contempt of the court, by refusing to do so, and it will be observed, that according to the conditions of the order, he was permitted to purge himself of the contempt by paying the money. An issue was thus made upon the subject as to whether or not he was in contempt of the court, and a full opportunity for defense allowed, before he was adjudged to be guilty of a contempt of the court. To make a valid order, the disobedience of which may be punished as a contempt, it is necessary, that the court have jurisdiction of the parties, and the subject matter of the action, and the power to make the order—that is, it must be within the issues of the cause in which it is made, and within the power of the court to make. McHenry v. State, 16 L. R. A. (N. S.) 1062; Daniel v. Owen, 72 N. C. 340. There can be no question, and no question is made, as to the court's jurisdiction of the parties to the action, and the subject matter of the action, and the order is within the issues of the action, as the suit is for recovery of the fund, in the hands of Abner Rudd, and for its distribution, in the settlement of the estate of the decedent. Hence, the question alone exists, as to the power of the court to make the order, and to enforce obedience to it, by imprisonment—that is, was the court under the law, as applied to the facts authorized to make the order, and to enforce it by process of contempt? The purpose of requiring the money to be paid into court, was that it might be administered and distributed as the assets of the estate of the decedent, which the court had undertaken to administer. The evidence, strongly, tends to prove, that the decedent was an old, infirm and feeble man, and he

died within a few weeks after the arrangement was effected, whereby Abner Rudd came into the possession of substantially all his property, except the $150.00 mortgage, and a few household goods.

Abner Rudd knew, that he was acquiring possession of the entire estate, as he, after the death of decedent, received the benefits of the $150.00 mortgage. He was obliged to know, that the arrangement was a fraud upon the rights of the widow. The right of a father to give, to his children, during the existence of a marriage relation, gifts of property if done under circumstances, which evidence good faith, is not questioned, but, when it is made with the purpose of defrauding the wife, it will be set aside, at least to the extent, that it affects the wife. Manikee's Admr. v. Beard, 85 Ky. 20. In Murray v. Murray, 90 Ky. 1, it was said: "If, however, a gift or voluntary conveyance of all or the greater part of his property be made to his children by a former marriage without the knowledge of the intended wife, or it be advanced to them after marriage without the wife's knowledge, a prime case of fraud arises, and it rests upon the beneficiaries to explain away the presumption." Redmond's Admr. v. Redmond, etc., 112 Ky. 760; Petty v. Petty, 4 B. M. 216; McAfee v. Ferguson, 9 B. M. 475; Fannessey v. Fannessey 1 R. 328. If the deceased was not unduly influenced to make the disposition, he was, also, a party to the fraud. If imbecile and overcome by undue influence, the transaction was void, and subject to attack by his administrator, or any of his heirs. Aside from the question of fraud, or undue influence, the writing, entered into, appears to have been in the nature of a testamentary disposition, as by its terms, the decedent retained control of the fund as long as he lived, and the distribution made by Abner Rudd, was to take place after the decedent's death. The paper was not executed so as to make it a valid testamentary disposition, and hence, it could have no validity after decedent's death, and the property in the hands of Abner Rudd, was undevised estate and passed as the property of an intestate. When Abner Rudd undertook then to distribute it, he became an executor *de son tort.* It was held in Hopkins v. Towns, 4 B. M. 124, that one who takes or has in his possession property of a deceased person under a fraudulent conveyance from him, thereby became an executor *de son tort.* In 11 R. C. L. 458, citing Rohn v. Rohn, 204

Ill. 184, it is said: "And since one who takes charge of the estate of an intestate must hold and account therefor to the widow and minor heirs in the proportion fixed by statute, it has been held, that if such person attempts to carry out the instructions of the intestate for a different disposition of the estate, he may be held liable as an executor *de son tort*." The contention that it was a trust created by the decedent in Abner Rudd, does not change the situation, as a trust fraudulently created, would not have the effect to pass the property any more than any other fraudulent disposition. An executor *de son tort,* is held to all the liabilities of a real personal representative, without any of the rights which attach to such an office.

The writing entered into between the widow and Bela Rudd, as agent for the heirs of decedent, five days after his death, and when the widow had just been informed thereof, does not present any defense to the judgment making the order complained of. In the first place, it does not appear, that he had any authority to represent the heirs, especially those, who never ratified his acts by receiving any of the benefits of the contract. The contract was without consideration upon the part of the widow, as she received nothing under it. True she had a right to give all the portion of the estate to which by law she was entitled, to the heirs of her deceased husband, but there is no pretense, that she intended or undertook to do this. She seems to have had some information received from her husband, as to the amount of his estate, or at least to what it had been, and that it was in the hands of Abner Rudd, but, at the time of the contract, Bela Rudd, who came directly from the scene of his father's death and from where his estate was supposed to be, represented, that there was not a sufficiency of it to pay the burial expenses. The writing prepared and signed to evidence the contract, according to its draftsman, was not written as he intended it, or as he explained its contents. It does not appear, that she had sufficient knowledge as to the amount of the estate, and made the contract understandingly, so as to be bound when there was no consideration for its execution upon her part, and she was relying upon the representation, that there was not a sufficiency of it to pay the burial expenses. The $400.00 note, which decedent paid for her, did not make a consideration to support the contract, as the answers

allege, that it was a loan, which was denied and there was no evidence upon the issue, except that of the widow, who testified, that decedent made a gift of it to her. It is not necessary to decide, whether the common law principle, to the effect, that the marriage of a woman extinguished any debt, which she was owing to her husband, before marriage, is still in force, as held in Dillon v. Dillon, et al., 24 K. L. R. 781; Farley v. Farley, 91 Ky. 497, and enunciated in 15 A. & E. Ency. of Law, 852, or not, as the decedent had a right to make a gift to the wife and all the evidence is to the effect, that he did so. Long v. Beard, 20 R. 1036; McWethey's Admr. v. McCright, 141 Ky. 816.

Had the court authority by a rule to require appellant to pay the money into court, and if so, could it compel obedience to its order by the process of attachment and imprisonment? It is insisted by appellant, that the judgment is one for the recovery of money, and to imprison him for failure to obey the order, is imprisonment for debt, and that same is in violation of the law of the state, as well as certain provisions of the Federal Constitution. While a commitment for contempt for failure to obey an order to pay money, is not an imprisonment for debt, as will be hereafter shown, there is no provision of the Federal Constitution, which prohibits imprisonment for debt under a judgment of a state court, and the provision of the Constitution of this State, upon the subject is section 18, which is as follows: "The person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison, after delivering up his estate for the benefit of his creditors, in such manner as shall be prescribed by law." The manner prescribed by law is sections 2180 to 2185, inclusive, Ky. Stats. It will thus be observed, that there is no constitutional provision of this state, which prohibits imprisonment for debt, but, the provision of the Constitution prohibits the continuing of a debtor in prison after he has delivered up his estate for the benefit of his creditors, unless there is a strong presumption, that the debtor has not made a bona fide delivery of his property. The statutes, however, govern the authority to imprison for debt. Two writs are provided for the collection of judgments in personam, for money, at law. Upon a judgment, for a trespass vi et armis, for seduction, slander, written or verbal, or for malicious prosecution, except when against

a female, a *capias ad satisfaciendum* may issue, by virtue
of which the defendant may be taken and committed to
prison, until he shall be delivered, as provided in section
2180, *supra*. For the collection of all other judgments,
for money, *in personam*, at law, a writ of *fieri facias*,
only, can issue and which can be levied upon the property
of the defendant, but his person can not be seized. An
ancillary process, of an order of arrest, may be issued
in civil actions, at the commencement of the action or
before judgment, against the defendant, in an action for
the recovery of money, where the defendant is about to
depart from the state, with the intention of defrauding
his creditors, and has removed or concealed his property,
so that the process of the court, after judgment, can not
be executed. This process is provided for, by chapter 1,
of Title VIII of Civil Code, and a defendant for whom
the order of arrest is issued, according to the provisions
of that chapter, may be committed to jail, in default of
bail, and upon judgments in actions, wherein an order of
arrest has been issued and not vacated, an execution
against the body of the defendant may be issued, and the
defendant committed to jail, until delivered, in accordance
with the provisions of section 2180, *supra*. Section 1661,
1650 Ky. Stats.; chapter 1, Title VIII, Civil Code. Final
orders and judgments, in chancery, may be enforced by
any appropriate writ of execution, allowable upon a
judgment at law, according to the nature of the case.
Section 1663, Ky. Stats. Subsection 2 of section 1663,
*supra*, however, provides: "Nothing in this article, shall
prevent any party from proceeding to carry an order or
judgment of court into execution according to the ancient
practice of courts of chancery." Anciently the only pro-
cess, which the courts of chancery had, by which to en-
force their orders and decrees was the process of attach-
ment and imprisonment. Latterly other processes came to
be used, but the writ of attachment has always been an
equity process. The chancellor, now has in this state, as
an incident of his equity or chancery jurisdiction, the
power to enforce the decrees, orders and judgments upon
the chancery side of the circuit courts, by the process of
attachment and imprisonment, except as hereinafter lim-
ited. Sebastian v. Rose, 135 Ky. 202; Rebhan v. Fuhr-
man, 21 K. L. R. 17; Ballard v. Capteton. 2 Met. 412;
Tyler v. Tyler, 99 Ky. 31; Evans v. Stewart, 38 S. W.
697. In analogy to the law, although he may render such

judgment, the chancellor will not exercise the power of enforcing a judgment, *in personam,* for money, where it is for the recovery of a mere debt, or claim in the nature of assumpsit, or upon a contract made between the parties, by the process for contempt, but will relegate the parties, to the usual processes of execution, except the circumstances be exceptional, as where one has obtained the other's money or property by fraud, and has it in possession and is attempting to depart from the state, Rebhan v. Fuhrman, *supra.* In Graham v. Sheets, 9 Ky. Opin. 701, this court said: "The right and power of the chancellor to enforce his judgments by summary process against the person of the defendant in a large class of cases, is not questioned, but that power is confined to the cases where the party occupies some fiduciary position, or where he dealt with the court as an officer of the court in an action, and became debtor to the court, and cases, in which it is authorized by statute. The simple fact, that the chancellor has rendered a judgment, does not authorize him to enforce it by process of contempt, without regard to the relation of the parties to each other and the court." The same principle was announced in Lowe v. Thornton, 1 Ky. Op. 8. The general rule is, that where there is a judgment for money, or an order to pay money, the court will not grant the equity processes of attachment and commitment for contempt, except in cases where the court has jurisdiction over a fund, or the fund is the subject of a suit and is in the possession of a party subject to the control of the court. 10 R. C. L. 565-566. The appellant in the instant case, as heretofore shown as an executor *de son tort,* was a fiduciary; the court has jurisdiction over the fund, in his hands, which is the subject of the suit, and over him, and in accordance with the foregoing principles, had authority to enforce its order by process of attachment and imprisonment for contempt, otherwise the court would be helpless. The provisions of sections 2180 to 2185, inclusive, are available, however, to such a contemnor. The rule is general, that the chancellor will not grant process of contempt to require the doing of an impossible thing, and if it is an order to pay money, and the contemnor is not able to do so, because of no fault of his, the process of attachment and imprisonment will not be granted. Turner v. New Farmer's Bank, 102 Ky. 473; State ex Rel McLean, 37 Mont. 485; Galland v. Galland, 44 Cal. 475. In the case

of a fiduciary, however, or one in a position of trust, the answer of inability to pay, will not excuse the contempt, when his inability arises from his having misapplied or misappropriated the trust funds, hence, the appellant's claim that he had paid five-sixths of the funds to others will not excuse him. His testimony shows that he is able to comply with the order of the court, but, he claims, that the funds he now has, is exempt to him as a housekeeper, but, his evidence shows, that he purchased the land for the sale of which he received the money, he now has, since he created the obligation, and has sold the land since the suit was filed against him. People v. Zimmer, 283 Ill. 607; Wise v. Chanc, 667 Ia. 73; Morrison v. Blake, 33 Pa., *supra*, 290; Jastram v. McAuslan, et al., 29 R. I. 390; Smith v. McLendan, 59 Ga. 523.

In jurisdictions, where the power to imprison for debt is prohibited by law, it is generally held by the courts that an attachment and imprisonment for contempt in disobedience of a court's orders to pay over money, is not imprisonment for debt, but, the punishment rests upon the power of the court to vindicate its authority and to punish for disobedience of it. In Re Meggot, 105 Wis. 291; Lester v. People, 150 Ill. 420; Bristol v. Pearson, 109 N. C. 718; Jastram v. McAuslan, *supra.*

The appellant can purge himself, by paying over the money ordered, and is able to do so.

The judgment is therefore affirmed.