## Burnam v. Commonwealth.

(Decided March 12, 1929.)

■411.

JOHN NOLAND for appellant.

J. W. CAMMACK, Attorney General (DOUGLAS C. VEST, of counsel), for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Reversing.

The appellant, Theo Burnam, was indicted on the charge of "making, uttering and delivering a cold check," committed by giving a check for $46.80 to one Wallace and thereby obtaining credit on a note then in his hands for collection. At the time the accused did not have any funds in the bank on which the check was drawn and did not satisfy it after having received notice of its nonpayment. A demurrer to the indictment was overruled. The defendant then entered a plea of guilty and was sentenced to serve one year in the penitentiary, from which judgment he appeals.

The demurrer should have been sustained. The indictment was wholly insufficient even under the law under which it was attempted to be drawn. But inasmuch as we have concluded that the act is unconstitutional, we need not discuss the indictment in those particulars.

The act (chapter 41, Acts of 1928, now section 1213a, Statutes, Supp. 1928) is a debt-collecting law. To that end it undertakes to invoke criminal processes and to inflict penalties which in their severity may be on occasion disproportionate to the seriousness of the offense endeavored to be created and the evil sought to be cured. The essential and controlling difference between the act and other statutes of this kind, including those of our own state enacted and repealed from time to time, is that the element of fraud or other criminal purpose is not an ingredient.

Guilt is established if "any person, who shall make, draw, utter or deliver any check, draft or other order for the payment of money upon any bank or other depository, and shall thereby obtain thereon money, goods or credit on any account which he then owes, not having at the time of such making, drawing, uttering or delivery, sufficient funds in such bank or other depository for the

412

payment of such check, draft or order in full upon its presentation." The same is true if one causes funds to be withdrawn from the bank without leaving sufficient on deposit to satisfy such paper. If it be for $20 or less, the maximum penalty is $100 fine and 30 days' imprisonment. For a second or subsequent similar offense the punishment is confinement of not less than one nor more than two years in the penitentiary. In case the amount involved exceeds $20, the penalty is not less than one nor more than five years in prison. In addition to prescribing the venue of the prosecution, it is provided that: "No indictment shall be made under the provisions of this act within ten days after the date of such check, draft or order." It is further provided that if the person who violates its terms "shall pay the same within ten days from the time he receives actual notice, written or verbal, of the dishonor of such check, draft or order, then any prosecution that may have been instituted within said time, if payment be made on such check as aforesaid, be dismissed at defendant's cost." Finally, post-dated instruments are made "subject to the provisions of this act and shall not escape the penalties hereof." And the concluding proviso is: "Nothing in this act shall apply to any person or persons under twenty-one years of age."

Howsoever innocently one may be acting, and whatsoever degree of good faith he may be exercising, he will nevertheless be guilty of a felony by drawing a check, draft, or order upon his bank without having sufficient funds to cover it; and the same is true as to innocently checking out funds on deposit after the instrument has been given. If the appellant had deposited to his own credit checks of others payable to himself and then had given the one on which he was indicted; and before it was cleared and had reached the bank on which it was drawn, the checks deposited by the defendant had been dishonored and charged back to his account, resulting in a deposit insufficient to meet the check, the effect under the statute would not have been otherwise. Bad faith or good faith, guilty intent or innocent purpose, the result is the same.

The giving of a check on an account or note, as in this case, merely changes the evidence and character of the debt. If not paid the creditor loses nothing. If this conviction should be sustained, when the appellant re-

turned after a year's service in the penitentiary he would still owe $46.80 and one more year's interest on the note covered by his check.

These observations are particularly true as to a post-dated check, which is in effect but a representation on the part of the payor that on a future date he will have funds with which to satisfy it, and is only an obligation on his part to pay the sum involved on a future date. As a species of commercial paper, what is the material difference between such a check and a negotiable promissory note? It also may be put in circulation as a medium of exchange. Can it be seriously contended that failure to pay a note by reason of financial inability is a crime? The barbarous practice of imprisoning one for a mere debt—the obligation not being the result of wrongdoing —is a thing of the past.

The act makes no distinction between a check, draft, and an order drawn on a bank. A check is drawn on a deposit subject thereto. A draft usually differs from a check in that it ordinarily requires a definite acceptance by the drawee. An order is commonly understood to be merely an assignment of a debt or obligation with directions to the one owing the assignor to pay it to the assignee. Like a draft, it may be on an individual or on a banking institution. Under this act, if an individual should fail to honor a draft or to accept such an order, no offense would be committed; but if a banking institution should for any reason—no matter whether valid or invalid—decline to accept the assignment, an offense would be committed. The relation existing between a banker and a depositor is that of debtor and creditor (Robinson & Co. v. Bank of Pikeville, 146 Ky. 538, 142 S. W. 1065, 37 L. R. A. (N. S.) 1186) and a check is but a pro tanto assignment of the deposit.

This extended analysis of the act is given for the purpose of disclosing its nature and showing the moving object and efficient cause of the enactment to be the collection of debts and penalizing of breaches of contracts by invoking the criminal courts and powers of the commonwealth instead of requiring the parties to resort to civil procedure. The soundness of this conclusion is made patent by the closing portion of the act which relieves those under 21 years of age of its provisions. Persons who are not old enough to be legally capable of entering into a binding contract and against whom civil actions

would not avail, do not come within its purview. The logic of the deduction is emphasized by the fact that offenders are not punished for making, uttering, or delivering the checks, drafts, or orders, but only for not paying them after they have been dishonored. Prosecution shall not be commenced until there has been a failure to satisfy the debt thus evidenced after a notice which is equivalent to a demand. The debtor is given ten days' grace, and if he cannot raise the money in that time, he suffers prosecution.

Guilty intent ordinarily may be inferred from an act (8 R. C. L. 60), and if one gave a check knowing it would not be honored, a criminal purpose could be inferred. But in the absence from the statute of such condition, no such inference may be indulged. It is true the maxim (liberally rendered) that a crime is not committed if the mind of the person doing the unlawful act is innocent does not always apply to offenses created by statute, and consequently is not an essential element of a statutory crime. In the exercise of the police power, the Legislature often prohibits the performance of a specific act in which neither moral turpitude nor evil motive is material. Usually the purpose and design of the legislative action renders unnecessary a guilty knowledge, but often courts import or read into the statute a proviso that the inhibited act shall be done from a guilty mind. 8 R. C. L. 63. Since the statute under consideration is palpably designed merely to enforce the collection of debts, as we have determined, it would appear that guilty knowledge was intentionally omitted as a constituent part, and the court is not authorized to interpret the act as involving that element, or to import a guilty or criminal intent to the one offending its provisions or coming within its scope.

Statutes of this character are usually sustained because they require that fraudulent intent must appear. A guilty knowledge and purpose must be the gravamen of the offense. Our former valid statute on this subject provided that the giving of a dishonored check was prima facie evidence of fraud, and transferred the burden to the defendant to disprove that criminal element. The cases sustaining that and other similar acts do not militate in any way against the conclusion reached. The natural and inevitable effect of the statute is to expose to conviction for crime those who simply fail or refuse to liquidate a debt, and to coerce payment by imprisonment, or the infliction of a fine.

The act is a declaration by the commonwealth to one party to a contractual transaction, whereby he had incurred a debt to the other, that unless he pays that debt he shall be arrested, tried, convicted, fined, and imprisoned at hard labor; and this obviously not for any taint of criminality in the transaction out of which the debt arose. For this default, unless it is purged by paying, before conviction, his debt to the prosecuting party, and the accrued costs of putting this coercion upon him, the debtor may be imprisoned. There is no pretense of punishing him for giving the paper if the preliminary notice or demand shall have the desired effect of extorting the money he owes. If this fails he may be branded a felon under the guise of punishing an act which is not criminal and which does not involve abstract criminality or the taint of moral turpitude, and which might up to the very moment of conviction have been shorn of even its factitious criminality by the payment of the obligation.

The Thirteenth Amendment of the Constitution of the United States is as follows:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

The twenty-fifth section of the Constitution of Kentucky is like unto it:

"Slavery and involuntary servitude in this state are forbidden, except as a punishment for crime, whereof the party shall have been duly convicted."

The court has apparently been called upon in only one instance to construe or apply these constitutional mandates. That portion of section 3151 of the statutes which authorizes compulsory labor by persons committed to jail by police courts of cities of the second class in default of surety for good behavior or to keep the peace, and all others whom the city is bound to maintain when committed to jail—to the extent that it embraces those included within the provisions of section 3058-14—was held unconstitutional, in Stone v. City of Paducah, 120 Ky. 322, 86 S. W. 531, 27 Ky. Law Rep. 717. This was on the ground that since such persons are not im-

prisoned because of their conviction of any offense it would be involuntary servitude and in violation of the foregoing constitutional provisions.

Our laws provide that prisoners must be put to work, and, in default of payment of fines, satisfaction is had by hard labor at an allowance of $2 a day. To provide service at hard labor in prison for nonpayment of a debt is in principle not far from that species of involuntary servitude, commonly called peonage, which is a status or condition founded upon an indebtedness of an employee to an employer. Both are predicated upon a breach of contract. In one case the creditor invokes the powers of the commonwealth, and in the other he exercises his own powers, and it would seem that they alike are violative of the constitutional edicts against involuntary servitude.

In 12 C. J. 938, it is pointed out that statutes making it a criminal offense to obtain money or property in consideration of a contract to perform services with an intent to injure or defraud are not repugnant to these provisions. "But if the statute goes further and makes a mere breach of the contract by a failure to perform the services prima facie evidence of an intent to defraud, it is void. And, in general, such statutes are void wherever the offense created by them is committed merely by the breach of a contract or the failure to pay a debt."

But whether the act invades the above constitutional provisions or not, it is clear that it offends section 18 of the Constitution, which reads as follows:

"The person of a debtor, where there is not strong presumption of fraud, shall not be continued in prison, after delivering up his estate for the benefit of his creditors in such manner as shall be prescribed by law."

Contrary to the general impression, there is no explicit prohibition of imprisonment for debt either in the Constitution of the United States or the Constitution of Kentucky. The Constitutions of many states do contain such mandates. 5 C. J. 438. However, the spirit of our Constitution is to prohibit such imprisonment. While courts do not hold invalid legislative acts merely because of repugnancy to the spirit of the constitutions (Cooley, p. 351), this act violates the text of section 18 of our Constitution, for it does not provide that one imprisoned

under its terms may obtain his liberty by delivering up his estate in satisfaction of the obligation evidenced by the check or order, or by taking an insolvent debtor's oath.

Judge Cooley, in his work on Constitutional Limitations, p. 714, declares:

"The control of the creditor over the person of his debtor, through the process which the law gives for the enforcement of his demand, is now very nearly abolished, thanks to the humane provisions which have been made of late by statute or by constitution. In cases of torts and where debts were fraudulently contracted, or where there is an attempt at a fraudulent disposition of property with intent to delay the creditor, or to deprive him of payment, the body of the debtor is allowed to be seized and confined."

A full consideration of the subject of imprisonment for debt, and the distinctions to be drawn between obligations arising ex contractu and ex delicto, may be found in notes appended to Carr v. State, 34 L. R. A. 634, and State v. Prudential Coal Co., L. R. A. 1915B, p. 645.

In the case of Napier v. Napier, 198 Ky. 233, 248 S. W. 530, it was held that one imprisoned under a rule of the chancery court for not paying maintenance for his wife and children, who had surrendered up his property, or taken the insolvent debtor's oath, under section 2180, etc., of the Statutes, was entitled to a release, it not appearing that the defendant had acted fraudulently, and the judgment of the court being simply one for debt and capable of measurement in dollars and cents. The philosophy of the opinion was that he had been imprisoned for debt. Under the act being tested, no such right is given a defendant. The insolvent debtor's statute under which the defendant secured his release in the Napier case does not encompass imprisonment under this act, and consequently it is not available.

Because of the absence of any requirement of fraudulent intent, the Tennessee Supreme Court held unconstitutional as being an indirect imposition of imprisonment for debt an act declaring it unlawful, and punishable by fine, for any person or corporation to refuse to cash or redeem in lawful currency any check or scrip within 30 days of issuance. State v. Paint Rock Coal & Coke Co., 92 Tenn. 81, 20 S. W. 499, 36 Am. St. Rep. 68.

Also an act requiring corporations which operate a commissary or supply store in connection with their business to pay wages to the employees in lawful money semimonthly, it being said that the act was obviously for the purpose of enforcing the payment of contract wages. State v. Prudential Coal Co., 130 Tenn. 275, 170 S. W. 56, L. R. A. 1915B, page 645.

The Missouri Supreme Court, in Kansas City v. Pengilley, 269 Mo. 59, 189 S. W. 380, L. R. A. 1917B, p. 551, on the same ground held invalid a city ordinance imposing a fine on any person who refused to pay for the use of a vehicle which he had hired, for the reason that the obligation arose out of a contract. It was declared that the constitutional mandate against imprisonment for debt could not be evaded by the device of declaring a simple breach of contract to be a crime. The ordinance did not require proof of fraud in the procurement and use of the vehicle.

There is a clear distinction between causes for imprisonment denounced in this class of cases and imprisonment as the result of disobedience of an order of a court to pay money. The theory of the latter authority is that it is for a contempt of the court.

In Rudd v. Rudd, 184 Ky. 400, 214 S. W. 791, this court considered the power of a chancellor to enforce his orders by imprisonment. As pointed out, that may be done as an incident of his equity jurisdiction, except in certain unusual cases and in the enforcement of a judgment in personam for money, or for the recovery of a mere debt or claim in the nature of assumpsit or upon a contract made between the parties. In such a state of case the court of equity will relegate the parties to the usual process of execution. Even where the chancellor has resorted to the use of this extraordinary power, the contemnor or other offender may by the specific terms of sections 2180 et seq., of the Statutes, have relief by surrendering up his estate or taking the oath of an insolvent debtor. But the terms of those statutes are limited, and, as stated, cannot be made to apply to prosecutions under the act being considered.

In 11 R. C. L. 852, under the title "False Pretenses," distinctions are made between various enactments designed to prevent offenses of that character founded upon invalid checks. It is shown that in such statutes it is essential that there should be on the part of one

giving the check both a present knowledge of insufficiency of funds in the bank and an intention to defraud. The subject of worthless check acts of the different states, with diversified provisions, is exhaustively treated in the annotations to State v. Price, 5 A. L. R. 1247, People v. Mutchler, 35 A. L. R. 344, Berry v. State, 35 A. L. R. 375, and State v. Tinnin, 43 A. L. R. 49.

An examination of the acts referred to in those annotations and other research reveal that in express terms all of them with two exceptions make the existence of a fraudulent intent an essential element of the crime denounced. One of those exceptions is a Georgia act (Georgia Laws 1914, p. 86), concerning which, in Neidlinger v. State, 17 Ga. App. 811, 88 S. E. 687, the Court of Appeals of Georgia declared:

· "It is plain that such fraudulent intent must exist and be operative before the drawing or uttering of the papers named in the statute would be criminal. The concept of a fraudulent intent must be read into the statute; otherwise, the law would be in contravention of the general provision that, to constitute crime, intent must concur with the act."

The element was in effect written into the act by the court, in justification of which, it was said:

"Otherwise, the act would be in effect nothing more than a means of enforcing promises and other civil obligations, and of collecting debts by the processes of criminal law, which is utterly abhorrent to our public policy as announced by the courts and as embodied in the constitution of our state."

That act was repealed in 1919, and another statute enacted (Georgia Law 1919, pp. 135, 220, sec. 34) requiring a guilty knowledge on the part of one giving the check or draft, or order and providing that the giving thereof should be prima facie evidence of intent to defraud. This was held not to be an imprisonment for debt, and its constitutionality upheld. Hollis v. State, 152 Ga. 182, 198 S. E. 783. This later act was considered also in Berry v. State, 153 Ga. 169, 111 S. E. 669, 35 A. L. R. 370, and it was pointed out that the gravamen of this offense is the intent to defraud, knowing at the time the check was given that the drawer did not have sufficient funds on deposit with which to meet it.

The second exception is the Kansas Act of 1915 ·(Laws 1915,.c. 92), construed in State v. Avery, 111 Kan. .588, 207 P. 838, 23 A. L. R. 453. The act, however, expressly provides that the check must be willfully drawn with *knowledge* at the time that there are no funds on deposit to meet it. This element is not in our act. The Kansas law was sustained upon the theory that its purpose was to discourage overdrafts and resulting bad banking, and, generally, to avert the mischief to trade, commerce, and banking which the circulation of worthless ·checks inflicts, and that the punishment was for resorting to a practice which the Legislature regarded as demoralizing to business.

Applying the organic law to chapter 41 of the Acts of 1928, under which the appellant was convicted, we are impelled to hold it unconstitutional.

It is proper to say that it does not follow that persons may fraudulently and.knowingly issue checks when they have no funds on deposit with which to meet them and not now be guilty of an offense. No preceding valid act on this subject was repealed by this unconstitutional act. 25 R. C. L. 913; Nuetzel v. State Tax Commission, 205 Ky. 124, 265 S. W. 606.

The judgment is therefore reversed.

Whole court sitting.